United States, Appellee

v.

David H. DONALDSON, JR., Sergeant
U.S. Army, Appellant

No. 02-0931

Crim. App. No. 9900544

_____

United States Court of Appeals for the Armed Forces

Argued April 9, 2003

Decided July 15, 2003

BAKER, J. delivered the opinion of the Court, in which
CRAWFORD, C.J., GIERKE, and ERDMANN, JJ., joined. EFFRON, J.,
filed a separate opinion concurring in part and in the result.

Counsel

For Appellant: Captain Gregory M. Kelch (argued);
Colonel Robert D. Teetsel, Lieutenant Colonel E. Allen Chandler,
Jr. and Major Imogene M. Jamison (on brief).

For Appellee: Captain Matthew J. Maclean (argued); Colonel
Lauren B. Leeker, Lieutenant Colonel Margaret B. Baines, and
Major Jennifer H. McGee (on brief).

Military Judge: James J. Smith

**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION**.

Judge BAKER delivered the opinion of the Court.

In accordance with his pleas, Appellant was convicted by a military judge, sitting as a general court-martial, of failure to report, disobeying an officer, disobeying a noncommissioned officer (three specifications), disrespect to a noncommissioned officer, failure to obey a lawful general regulation, driving while intoxicated, cocaine use (two specifications), assault (two specifications), adultery, breaking restriction, and disorderly conduct, in violation of Articles 86, 90, 91, 92, 111, 112a, 128, and 134, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 886, 890, 891, 892, 911, 912a, 928, 934 (2000), respectively. Contrary to his pleas, Appellant was convicted of indecent acts with a child less than sixteen years of age and communicating a threat, in violation of Article 134.

The adjudged sentence included seven years' confinement, a reduction to the lowest enlisted grade, forfeiture of all pay and allowances, and a dishonorable discharge. The convening authority reduced the confinement to seventy-eight months, but otherwise approved the adjudged sentence. He also granted Appellant 239 days of credit against his sentence to confinement. The Army Court of Criminal Appeals affirmed the findings of guilty and the sentence in an unpublished opinion.

United States v. Donaldson, No. 02-0931/AR

United States v. Donaldson, ARMY No. 9900544 (A. Ct. Crim. App. June 10, 2002). We granted review on the following issue:

> WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED IN HOLDING THAT THE HEARSAY TESTIMONY OF BT WAS ADMISSIBLE UNDER MILITARY RULE OF EVIDENCE [HEREINAFTER M.R.E.] 803(2), THAT THE HEARSAY TESTIMONY OF DR. ROGERS WAS ADMISSIBLE UNDER M.R.E. 803(4), AND THAT THE HEARSAY TESTIMONY OF DR. ROGERS AND INVESTIGATOR BASS-CAINE WAS ADMISSIBLE UNDER M.R.E. 803(24).[*]

We hold that the Court of Criminal Appeals did not err in holding J's statements to BT admissible as excited utterances under M.R.E. 803(2). We further conclude that the court correctly held that J's statements to Dr. Carrie Rogers were admissible under M.R.E. 803(4) as statements made for purposes of medical diagnosis or treatment. As such, we do not address whether these statements to Dr. Rogers would have been admissible under M.R.E. 807. Finally, we hold that J's statements to Investigator Tracy Bass-Caine were properly admitted as residual hearsay under M.R.E. 807. As a result, we affirm the lower court's opinion.

---

[*] Pursuant to the June 1999 Amendments to the Military Rules of Evidence, M.R.E.s 803(24) and 804(b)(5) were combined and promulgated as M.R.E. 807. Stephen A. Saltzburg et al., Military Rules of Evidence Manual 228-29 (4th ed. & Supp. 2002). The change did not alter the meaning or application of the residual hearsay exception. Id. Because of this change and to avoid confusion, this opinion will refer to M.R.E. 807 in lieu of 803(24), even though the military judge and the Court of Criminal Appeals referred to the rule as 803(24).

FACTS

The alleged errors underlying this appeal relate to the military judge's decision to allow several witnesses to testify about the hearsay statements of a three-year-old victim, J. The relevant statements concerned indecent acts committed by Appellant on the victim and threats Appellant made to her to keep her from reporting his misconduct.

At the time of the offenses J lived with her single mother, BT, and her brother John. Also residing in the home was Appellant's girlfriend, SK, who rented a room and helped pay the bills. Because SK lived with the family, Appellant frequently spent time in the home.

At approximately 7:00 a.m. on November 11, 1996, BT was getting ready to go to a 9:00 a.m. doctor's appointment. While she was getting ready, J was running back and forth in the hallway between her mother's bedroom and SK's bedroom. SK was taking a shower and getting ready in another room, and Appellant was in SK's bedroom. BT testified that she periodically called out to J to find out what she was doing. In response to BT's inquiry, J responded, "I'm up here in [SK's] room."

At about 8:00 a.m., BT was ready to depart her residence with J to go to the doctor's appointment. At that time, she noticed that J was unusually quiet. BT testified that throughout the rest of the day, J was very "cling[y]," would not

urinate, wanted to be carried, and would not let "[me] get out of her sight."  After the doctor's appointment, BT and J went to the mall and then returned home.  Ms. Elaine Sandreth, a friend, accompanied BT and J to the doctor's office and to the mall.

That evening, at approximately 7:00 p.m., BT gave J a bath. At one point, BT attempted to wash between J's legs, but J resisted saying, "No, no, no."  After getting J out of the bathtub, BT started drying J off.  When BT attempted to dry J's vaginal area, J began to cry.  BT attempted to look between J's legs to see what was wrong.  According to BT, J again resisted, held her legs together, and became "really hysterical, crying and even more."  After several minutes, BT was able to calm J down and look between her legs.  She testified that the skin in the vaginal area was "real raw, red and irritated."  She further stated that J became "very, very hysterical . . . screaming and crying."  When BT asked her what was the matter, J stated, "Him touched me."  When BT asked her who had touched her, J stated "Him, Dave."  BT then asked her, "What do you mean Dave touched you?"  J responded by pointing to the top part of her vaginal area with her little finger.  J also stated that the touching had occurred that morning.  When BT asked J why she did not tell her that Appellant had touched her, J responded, "Him said he would kill you, John and me, if I told you."  Appellant was the only "Dave" J knew.

After J calmed down, BT called her sister to discuss J's statement. Her sister advised her to call the police. BT also called a friend who came over to discuss the situation. BT then proceeded to call the police. While waiting for the police to arrive, BT called SK at work and told her to come home because they needed to talk.

The police eventually arrived and began filling out a report. SK also came in, and SK and BT began arguing over Appellant's inappropriate touching of J. J was present during the argument, and BT testified that J was "very nervous . . . [and] a little bit upset." At one point, J put her hands over her ears while BT and SK yelled at each other. Finally, Investigator Bass-Caine, a child abuse investigation specialist from the Fayetteville Police Department, arrived to help with the investigation.

Investigator Bass-Caine took J into a bedroom and interviewed her privately. Investigator Bass-Caine asked J who lived in the house. J told her that her brother and mother lived in the house, as did SK and "Dave." Investigator Bass-Caine testified that when J mentioned Appellant's name, she stated that she did not like him. Investigator Bass-Caine asked her why she did not like Appellant, to which J responded, "Because Dave hurt me." Investigator Bass-Caine testified that when she asked J how Appellant had hurt her, J pointed to her

6

vaginal area and stated, "He touched me.  He touched me there."
When Investigator Bass-Caine asked her whether Appellant had
touched "the inside or the outside," J "laid back on the bed,
pulled her panties to the side, and stuck her finger . . . real
close in her vaginal area."  Investigator Bass-Caine testified
that she was surprised at J's reaction in leaning over and
revealing her private parts.  She stated that she had never seen
another child abuse victim respond in such an "animated" manner.
She further testified that J did not appear to be upset at the
time she related this information to her.

      After Investigator Bass-Caine completed her report, the
officers left.  BT did not take J to the doctor that evening,
but waited until the next morning to have a physician examine
her.  An examination revealed that there "was no evidence of
bruising, no evidence of any discharge, no evidence of any
swelling or any laceration."  The examination further noted that
J's "anatomy was normal, only some minor erythema or redness."
The doctor was unable to determine whether there was any digital
penetration.  The doctor further testified that the redness
could have been caused by any number of things.

      In the months following the incident, BT noticed a change
in J.  J began "wetting the bed, walking in her sleep, having
nightmares, [she] did not want to be alone, didn't want [BT] out
of her sight."  In addition, J began throwing things, acting

out, and physically hurting herself.  Finally, J was still very clingy, and was traumatized each time she saw a black Nissan pickup truck, similar to the one driven by Appellant.

Because of J's declining behavior, BT took J to see a child clinical psychologist, Dr. Rogers.  BT told J that they "were going to see a doctor who would help her get better and get over the nightmares and the rages, the crying."  In January 1997, J had her first meeting with Dr. Rogers.  Dr. Rogers testified that she told J that she was "not a shot doctor and not a doctor that looks in ears and at teeth; but a doctor that talks about feelings and worries."  Her testimony in this respect, however, was contradicted by her answers on cross-examination and re-cross-examination.  In response to several of defense counsel's questions, Dr. Rogers stated that she did not remember exactly what she told J.  She added that she was not sure whether J knew why her mother had brought her or what kind of doctor she was.

J met with Dr. Rogers in the early part of 1997 and then again in late 1998, in all meeting with her 13 times.  During the sessions, Dr. Rogers talked with J.  She also frequently played with J on the floor or drew pictures with her.  Dr. Rogers testified that during the second session, J told her that "Dave" had touched her.  She further testified that, in a later session, J told her, while pointing to her vaginal area, that "[Dave] put his finger on [her]."  The doctor stated that a

"recurring theme" during these sessions "was that [Dave] had said if [J] talked about what had happened, he was going to get her, hurt her, her family." To aid J in discussing the abuse, Dr. Rogers would have J draw pictures about the incident. On several occasions, J drew pictures of Appellant, "describing him as mean and ugly, drew him as a worm, as a monster[.]" On occasion, J would yell at these drawings or stomp on them.

Appellant was eventually charged with committing indecent acts upon J and communicating a threat to her. At trial, the Government sought to have BT, Investigator Bass-Caine, and Dr. Rogers testify regarding J's statements to them under various exceptions to the hearsay rule. To prevent the hearsay testimony, Appellant submitted a motion in limine, arguing that J's hearsay statements were not admissible under M.R.E.s 803(2), 807, or 803(4). During a hearing on the motion, pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), the Government argued that J's statements to her mother and Investigator Bass-Caine were admissible as excited utterances under M.R.E. 803(2). The Government further maintained that J's statements to Dr. Rogers were admissible under M.R.E. 803(4) as statements made for the purpose of medical diagnosis or treatment.

J testified during the hearing and on the merits, but neither trial counsel on direct examination, nor defense counsel on cross-examination, could get her to discuss the facts

relevant to the charged offenses.  She discussed general details about her life and family, but was unable or unwilling to elaborate on her relationship with Appellant, SK, or Dr. Rogers.

After the Article 39(a) session, the military judge denied the defense motion.  The military judge concluded that J's statements to her mother and Investigator Bass-Caine were admissible as excited utterances.  In reaching this conclusion, the judge found that the statements related to a startling event (Appellant's indecent touching and threat) and that "they were made while [J] was still under the stress and excitement caused by the event, and they were not the result of reflection or fabrication."

As to J's statements to Dr. Rogers, the judge determined that they were admissible under M.R.E. 803(4).  In reaching this conclusion, the military judge made several findings.  First, he found that Dr. Rogers "told the victim that her role was to help the victim feel better."  He also found that "J understood that Dr. Rogers was her doctor, and that she went to Dr. Rogers to feel better."  The judge therefore reasoned that J made the statements for the purpose of medical diagnosis with "some expectation of receiving a medical benefit."  Finally, in the alternative, the judge determined that all three statements were admissible as residual hearsay under M.R.E. 807.  In making this

determination, the judge did not make specific findings of fact,

but stated:

> In the alternative, all of these statements were admissible because the victim testified at trial, was subject to confrontation and cross-examination, and the totality of the circumstances indicated that the statements were trustworthy. The court determined that (A) the statements were offered as evidence of material facts; (B) the statements were more probative on the points for which they were offered than any other evidence the government could procure through reasonable efforts; and (C) the general purpose of the rules of evidence and the interests of justice were best served by admission of the statements into evidence[.]

The Army Court of Criminal Appeals in affirming the

military judge's decision, held that J's statements to her

mother were excited utterances under M.R.E. 803(2). Donaldson,

ARMY No. 9900544, slip op. at 5-6. The court also agreed that

J's statements to Dr. Rogers were admissible under M.R.E.

803(4). The court, however, held that J's statements to

Investigator Bass-Caine were not excited utterances. The court

found that J made the statements "in a calm, matter-of-fact

manner and, thus, [the statements were] made as a result of

recall not as a result of the event." Id. at 7. The court

therefore concluded: "The circumstances surrounding [J's]

statement and the nature of her responses to Investigator Bass-

Caine's questioning, convinces us that they were reflective and

not made under the stress or excitement of events from the

past." Id. (citing United States v. LeMere, 22 M.J. 61, 68

11

(C.M.A. 1986)).  Nevertheless, the court affirmed the military judge's conclusion that J's statements to Investigator Bass-Caine were admissible as residual hearsay under M.R.E. 807.  Id. at 9.

In his appeal to this Court, Appellant again asserts that J's statements to her mother, Dr. Rogers, and Investigator Bass-Caine are inadmissible hearsay statements.  He argues that J's statements to her mother were not made under the stress or excitement of a startling event.  Specifically, he asserts that considering the significant time gap between the event and J's statement, J's statements to her mother were made upon reflection.  Second, Appellant maintains that J's statements to Dr. Rogers "were not made with the understanding that if she were truthful, she would be helped."  Finally, Appellant asserts that J's statements to Investigator Bass-Caine lacked "equivalent circumstantial guarantees of trustworthiness comparable to other hearsay exceptions."  As such, Appellant argues that the military judge and the lower court erred in admitting these statements under M.R.E.s 803(2), 803(4), and 807.

We review a military judge's ruling on the admissibility of evidence for abuse of discretion.  United States v. Moolick, 53 M.J. 174, 176 (C.A.A.F. 2000)(citing United States v. Hyder, 47 M.J. 46, 48 (C.A.A.F. 1997)).  An abuse of discretion occurs

12

when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact.  United States v. Humpherys, 57 M.J. 83, 90 (C.A.A.F. 2002).

## DISCUSSION

A.   Admissibility of J's Statement to BT Under M.R.E. 803(2).

An otherwise inadmissible hearsay statement is admissible under M.R.E. 803(2), even though the declarant is available as a witness, if (1) the statement relates to a startling event, (2) the declarant makes the statement while under the stress of excitement caused by the startling event, and (3) the statement is "'spontaneous, excited or impulsive rather than the product of reflection and deliberation.'" United States v. Feltham, __ M.J. ___ (C.A.A.F. 2003); United States v. Arnold, 25 M.J. 129, 132 (C.M.A. 1987)(quoting United States v. Iron Shell, 633 F.2d 77, 86 (8th Cir. 1980), cert. denied, 450 U.S. 1001 (1981)).

Appellant does not dispute that sexual abuse accompanied by a threat of harm would constitute a startling event.  Nor does Appellant dispute that J's statements related to sexual abuse and a threat of harm.  Appellant contests the military judge's finding that J's statements to BT were spontaneous statements made under the stress or excitement of a startling event. Citing United States v. Grant, 42 M.J. 340, 343 (C.A.A.F. 1995), United States v. Richmond, 26 M.J. 226 (C.M.A. 1988), and several service courts, Appellant argues that there is a

13

difference between an utterance made under stress and excitement and one made upon sad reflection or under the trauma of having to retell events after one has calmed down.  Under these cases, and Judge Everett's dissent in Arnold, 25 M.J. at 135, he contends that the latter statements do not qualify as excited utterances.  Appellant places particular emphasis on the time lag between the startling event and J's statement to her mother. He asserts that J clearly had time to calm down, and her later excitement, if any existed, was the product of trauma upon reflection and was not an excited utterance.  Further, Appellant distinguishes his case from Arnold by arguing that, unlike the victim in Arnold, J "had no reason to wait until that evening to find a 'compassionate adult [that she could] trust.'"  He asserts that because she was with her mother all day, she had an opportunity to discuss the event earlier in the day.  He therefore maintains that J's statements were prompted by her mother's questioning and not the stress and excitement of a startling event.

The argument that statements made after one has calmed down can never be excited utterances presents an unsettled legal question.  The "implicit premise" underlying the excited utterance exception is "that a person who reacts 'to a startling event or condition' while 'under the stress of excitement caused' thereby will speak truthfully because of the lack of

14

opportunity to fabricate." United States v. Jones, 30 M.J. 127, 129 (C.M.A. 1990). This premise becomes more tenuous where the exciting influence has dissipated and one has had the opportunity to deliberate or fabricate. Even if one were to have a renewal of the stress involved in the original exciting event, the existence of a deliberative period increases the concern that subsequent statements will be inaccurate or contrived. On the other hand, some courts and commentators have accepted the premise that even after the excitement of a startling event has dissipated, a subsequent statement may constitute an excited utterance if a renewal of the excitement provides an adequate safeguard against fabrication. See United States v. Napier, 518 F.2d 316, 317-18 (9th Cir. 1975) (admitting a statement as an excited utterance where the declarant was "suddenly and unexpectedly confronted with a photograph of her alleged assailant," even though the statement related to a startling event that occurred a week prior); 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 435, at 401-02 (2d ed. 1994)(noting the risks associated with applying the exception after the "stress subsides," but implicitly accepting that admission may occur under the right conditions).

We ultimately need not resolve the question of whether the excited utterance exception can apply to statements made after

15

the original stress of excitement caused by the event has subsided.  We are convinced there was sufficient evidence for the military judge to conclude that J made the statements to her mother while she "was under the stress of excitement caused by the event, and they were not the result of reflection or fabrication."

In determining whether a declarant was under the stress of a startling event at the time of his or her statement, courts have looked to a number of factors.  These may include: "the lapse of time between the startling event and the statement, whether the statement was made in response to an inquiry, the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event, and the subject matter of the statement."  Reed v. Thalacker, 198 F.3d 1058, 1061 (8th Cir. 1999).  See Morgan v. Foretich, 846 F.2d 941, 947 (4th Cir. 1988).  A lapse of time between a startling event and an utterance, while a factor in determining whether the declarant was under the stress of excitement caused by the event, is not dispositive of that issue.  Arnold, 25 M.J. at 132 (citing Garcia v. Watkins, 604 F.2d 1297, 1300 (10th Cir. 1979)); United States v. Scarpa, 913 F.2d 993, 1017 (2d Cir. 1990); Iron Shell, 633 F.2d at 85.

As a general proposition, where a statement relating to a startling event does not immediately follow that event, there is

a strong presumption against admissibility under M.R.E. 803(2). Jones, 30 M.J. at 129. However, courts have been more flexible in cases in which the declarant is young, particularly where the statement was made during the child's first opportunity alone with a trusted adult. See id. (acknowledging that children may stay excited longer than adults); Arnold, 25 M.J. at 132 (statement of 16-year-old rape victim held admissible despite at least a 12-hour lapse between the rape and the statement); United States v. Farley, 992 F.2d 1122, 1126 (10th Cir. 1993)(admitting statements of five-year old though one statement was made two hours after the assault and the other at least 12 hours after the assault); Morgan, 846 F.2d at 947 (finding that a four-year old's three-hour lapse in reporting an assault was "well within the bounds of reasonableness" for an excited utterance); Goss v. Greer, 773 F.2d 116, 119-20 (7th Cir. 1985)(holding that a lower court properly admitted a four-year old's hearsay statement although she made it 12-15 hours after the startling event); Iron Shell, 633 F.2d at 86 (admitting statement of nine-year-old victim as an excited utterance although she made the statement one hour after the assault); but see Thalacker, 198 F.3d at 1062 (questioning the rationale for applying the excited utterance exception differently for children and adults).

17

In Appellant's case, the military judge found that J made the statements to her mother while she "was under the stress and excitement caused by the event." This finding is supported by the facts. It is undisputed that J was three years old at the time of the event. She was able to demonstrate exactly where she claimed Appellant had touched her. J's mother testified that J's behavior throughout the day was abnormal. She stated that J was unusually quiet and clingy. Furthermore, she testified that when she attempted to wash J's vaginal area, J became "hysterical."

As to the lapse in time, the military judge's findings indicate that J must have made her statement within roughly 11 to 12 hours of the abuse. Although the lapse in time is significant, it is made less significant by the fact that there was evidence indicating that Appellant threatened to kill J, her brother and her mother if she told about the abuse. See Arnold, 25 M.J. at 132. Under the circumstances, the delay was not so long that it was clearly erroneous for the judge to find that J was still under the stress of a startling event.

Finally, contrary to Appellant's contention, there were facts supporting the military judge's finding that J and her mother were not alone during the day. BT testified that her friend, Ms. Sandreth, accompanied her and J to the doctor's office and to the mall. She also stated that on their way home

from the mall, they picked up J's brother.  Appellant has failed to show that this finding was clearly erroneous.

While the facts of United States v. Grant, 42 M.J. 340 (C.A.A.F. 1995), are similar to those present in this case, there are significant differences that distinguish it from this case.  Unlike the present case, the victim in Grant appeared to be happy, was not acting abnormally, and was "'telling . . . about all the Christmas presents she had received'" just prior to making her hearsay statement.  Id. at 341.  Moreover, the victim in Grant made her statement 36 to 48 hours after the alleged startling event, three to four times the lapse in this case.  Id.  Finally, unlike J's distressed response in this case, the victim in Grant appeared "'very sad and teary eyed'" when she made her statements.  Id.  These distinctions suggest that Appellant's reliance on Grant is misplaced.

On the facts of this case, the military judge did not clearly err in finding that J was still under the excitement and stress of a startling event when she made the incriminating statements about Appellant to her mother.  Therefore, there was no abuse of discretion in admitting the statements as excited utterances.

B.   Admissibility of J's Statements to Dr. Rogers Under M.R.E. 803(4).

19

Under M.R.E. 803(4), certain hearsay statements made to medical personnel are admissible even though the declarant is available as a witness.  Those statements include:

> Statements made for purposes of medical diagnosis or treatment and described medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

M.R.E. 803(4) is not limited to statements made to licensed physicians.  In United States v. Welch, 25 M.J. 23, 25 (C.M.A. 1987), this Court held that a victim's statements to a psychologist fell within the scope of M.R.E. 803(4).  Several years later, in United States v. Morgan, 40 M.J. 405 (C.M.A. 1994), we stated that under the "proper circumstances, statements made to psychologists, social workers, and other health care professionals may well fall within the purview of the medical-treatment exception to the hearsay rule."  Id. at 408 (citing Welch, 25 M.J. at 25).  See United States v. Haner, 49 M.J. 72, 77 (C.A.A.F. 1998).  We ultimately held in Morgan that a victim's statements to two social workers qualified as statements of medical diagnosis or treatment under M.R.E. 803(4).  Id. at 409.  Our position is consistent with a number of federal circuits who have held that statements to psychologists are admissible as statements for the purpose of medical diagnosis or treatment under Fed. R. Evid. 803(4).  See

United States v. Yellow, 18 F.3d 1438, 1442 (8th Cir. 1994);

United States v. Newman, 965 F.2d 206, 210 (7th Cir. 1992);

Morgan, 846 F.2d at 949 n.17.

Statements offered under M.R.E. 803(4) must satisfy two requirements to be admissible: "first the statements must be made for the purposes of 'medical diagnosis or treatment'; and second, the patient must make the statement 'with some expectation of receiving medical benefit for the medical diagnosis or treatment that is being sought.'" United States v. Edens, 31 M.J. 267, 269 (C.M.A. 1990)(quoting United States v. Deland, 22 M.J. 70, 75 (C.M.A. 1986), cert. denied, 479 U.S. 856 (1986)). While both requirements must be met, the "critical question [in this inquiry] is whether [the patient] had some expectation of treatment when she talked to the caregivers." Haner, 49 M.J. at 76. "The key factor in determining whether a particular statement is embraced by the medical-treatment exception is 'the state of mind or motive of the patient in giving the information to the physician and the expectation or perception of the patient that if he or she gives truthful information, it will help him or her to be healed.'" Morgan, 40 M.J. at 408 (quoting United States v. White, 25 M.J. 50, 51 (C.M.A. 1987)). In United States v. Siroky, 44 M.J. 394, 400 (C.A.A.F. 1996), we recognized that "a small child may not be able to articulate that he or she expects some benefit from

21

treatment."  Thus, we stated that where a child is involved, "it is often important for their caretakers to explain to them the importance of the treatment in terms that are understandable to the child."  Id. (citing United States v. Avila, 27 M.J. 62, 66 (C.M.A. 1988)).  A military judge's determination that a patient made a statement for the purpose of medical diagnosis or treatment out of an expectation of receiving medical benefit is a question of fact that we review for clear error.  Siroky, 44 M.J. at 399.

Looking only at J's visits with Dr. Rogers, there is little evidence that J would have understood that Dr. Rogers was a doctor from whom she could have expected some medical benefit. Dr. Rogers testified that she did not wear a doctor's coat, she did not do a physical examination, she did not give shots or take J's temperature or blood pressure.  Further her office was in a shopping center and not a medical facility like a hospital or an outpatient treatment office, which might otherwise have suggested to J that Dr. Rogers was a doctor.  Finally, she testified that J's visits often consisted of the two of them playing or drawing together.

Moreover, Dr. Rogers' testimony regarding what she told J was contradictory.  At one point she stated that she told J she was a doctor, but not a shot doctor.  On cross-examination, though, she stated that she did not remember exactly what she

told J.  She added that she was not sure whether J knew what kind of doctor she was or why J was there.  Still later in her testimony, the doctor testified that she was confident she told J that she was a doctor and that her role was to help J deal with what was bothering her and to help make things better. Yet, on re-cross-examination, she again stated that she did not recall what she told J.  Further, Dr. Rogers stated that she did not know whether J understood that she was a doctor or whether J knew why she came to Dr. Rogers' office.

On the other hand, J's mother's testimony strongly supports a conclusion that J had an expectation of medical benefit when she visited with Dr. Rogers.  BT testified that before she took J to Dr. Rogers, she told J that she was going to take her to "see a doctor who would help her get better and get over the nightmares and the rages, the crying."  She further stated that J "seemed to understand" why she needed to see Dr. Rogers.

Although a child's testimony about his or her expectation of receiving medical benefit would normally be given great weight, J's in-court affirmation that she went to Dr. Rogers to get better, while relevant, is not conclusive for several reasons.  First, she initially was unable or unwilling to testify about why she went to see Dr. Rogers.  It was only after trial counsel asked her whether she went to see Dr. Roger "to feel better" that she nodded her head in the affirmative.

23

Second, when asked why she needed to get better, J was unable to answer and only shrugged her shoulders.  Finally, it is unclear from J's statement whether, at the time she began her counseling sessions with Dr. Rogers, she expected a medical benefit as required by M.R.E. 803(4).

Based on the above testimony, the military judge made the following findings:

> Prior to going to see Dr. Rogers, the victim's mother told her that they were going to see a doctor who would help her get better and get over the rages, crying and nightmares . . . . At the beginning of the first session, Dr. Rogers explained to the victim that she was not a doctor who gives shots or looks in ears or at teeth, but she was a doctor who talks about "feelings" and "worries."  Dr. Rogers told the victim that her role was to help the victim feel better.  The victim understood that Dr. Rogers was her doctor, and that she went to Dr. Rogers to feel better.

Based on the totality of the evidence presented, we hold that the military judge did not clearly err in finding that Dr. Rogers told J she was a doctor and that she would help J feel better.  Moreover, while we recognize that this is a close case, the testimony of J, and particularly that of her mother, support the judge's finding that J understood that Dr. Rogers was a doctor and that she was going to help J get over her problems.

Appellant argues that this case is similar to United States v. Faciane, 40 M.J. 399 (C.M.A. 1994) and Siroky, both cases in which we concluded that there was insufficient evidence to find that a child/declarant had an expectation of receiving a medical

24

benefit by talking with mental health professionals.  However,
we believe this case is distinguishable from Faciane and Siroky.

In Faciane, a mother suspected her ex-husband of sexually
abusing their three-year-old daughter.  40 M.J. at 399-400.  She
decided to file a police report and take her daughter to a
children's counselor at an area hospital.  Id. at 401.  She
testified that she told her daughter that "she was going to go
see a doctor there and there would be a lady there for her to
talk to."  Id.  However, she later admitted that she could not
recall exactly what she told her daughter.  Id.  The counselor
who interviewed the child was not dressed like a doctor, did not
conduct any physical examination, and met with the child in an
office filled with toys.  Id.  The counselor was unable to
remember exactly what she told the child she was there for,
except that she thought she told the child that she was "going
to talk and play with her."  Id.

Based on these facts, we held that there was insufficient
evidence to support the military judge's conclusion that the
child's statements were admissible under M.R.E. 803(4).  Id. at
403.  In so doing we stated:

> Although the child may have associated a hospital with
> treatment and may have known that she was in a
> hospital when she talked with Mrs. Thornton, there is
> no evidence indicating that the child knew that her
> conversation "with a lady" in playroom surroundings
> was in any way related to medical diagnosis or
> treatment.  Mrs. Thornton testified that she did not

25

> present herself as a doctor or do anything medical.
> There is no evidence that Mrs. Thornton was dressed or
> otherwise identified as a medical professional.  The
> interview took place in a room filled with toys.
> <u>There is nothing suggesting that the child made the
> statements with the expectation that if she would be
> truthful, she would be helped</u>.

<u>Id.</u> (emphasis added).

Similarly, in <u>Siroky</u>, a mother took her two-and-a-half-year-old daughter to a psychotherapist, claiming that the child had been sexually abused by the child's father.  44 M.J. at 395.  The doctor was unable to remember whether she introduced herself as a doctor.  <u>Id.</u>  She testified that she generally introduced herself to her patients as a "helper" and was there to talk about "feelings and to help" the child.  <u>Id.</u>  The doctor and the child played with toys together.  <u>Id.</u>  When asked on cross-examination whether she believed the child was aware of why the family visited her office, the doctor stated, the child's "family and mother . . . would refer to me as 'the lady' or 'the doctor.'"  <u>Id.</u> at 397.  She also stated that she did not think a child so young would understand what a counselor was, although the child would understand that she was a helper.  <u>Id.</u>

Based on this testimony, we held that M.R.E. 803(4) was inapplicable.  In so holding we explained:

> Even if there was clearly sufficient evidence to meet
> the requirement that the statements were made for the
> purposes of treatment, <u>there is simply insufficient
> evidence in the record to support the expectation-of-
> treatment prong</u>.  As this prong focuses on the

26

> declarant's state of mind, we recognize that a small child may not be able to articulate that he or she expects some benefit from treatment. Thus it is often important for their caretakers to explain to them the importance of the treatment in terms that are understandable to the child. Not only did [the child] not testify in this trial, but also there is no evidence on the record that her mother explained the importance of treatment to [the child]. Specifically, the record does not give us any indication that the statements made by [the child] concerning her father on July 24, 1992, were believed by her to be pertinent to treatment. Further as in Faciane, there is insufficient evidence for us to draw the inference that [the child] must have known that any statement she made would help her in treatment. [The counselor] did not present herself as a doctor and did not engage in any activity which [the child] could have construed as treatment. Further, the interviews with [the child] were conducted in a room filled with toys.

Id. at 400-01 (emphasis added).

Unlike Faciane and Siroky, there is evidence in this case to indicate that J understood that Dr. Rogers was a doctor. Taken together, the testimony of Dr. Rogers, BT, and J, provided the military judge with sufficient facts for him to find that J expected some medical benefit from discussing her problems with Dr. Rogers. We therefore hold that the judge did not abuse his discretion by admitting J's statement to Dr. Rogers under M.R.E. 803(4), and therefore, in response to the granted issue, conclude that the Court of Criminal Appeals did not err in affirming the military judge's admission of J's statements to Dr. Rogers.

Because we hold that the military judge did not err in admitting J's statements to Dr. Rogers under M.R.E. 803(4), we need not reach whether the statements were also admissible as residual hearsay under M.R.E. 807.

C.   Applicability of J's Statements to Investigator Bass-Caine Under M.R.E. 807.

Appellant's final argument is that J's statements to Investigator Bass-Caine were inadmissible under M.R.E. 807. M.R.E. 807 is a residual hearsay exception rule, permitting a party to introduce hearsay evidence that does not otherwise fall under the exceptions contained in M.R.E.s 803 and 804, where certain requirements are met.  The rule states:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.  However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

(Emphasis added.)

Appellant argues that the lower court erred in concluding that J's statements to Investigator Bass-Caine were reliable

28

because they were accompanied by circumstantial guarantees of trustworthiness like those supporting the other hearsay exceptions.

In United States v. Giambra, 33 M.J. 331, 334 (C.M.A. 1991), we stated that for a hearsay statement to be admissible under the residual hearsay exception it "must have 'equivalent circumstantial guarantees of trustworthiness' as do the first 23 exceptions."  In determining whether a statement is supported by circumstantial guarantees of trustworthiness, we look to a number of indicia of reliability.  These may include, among other things: (1) the mental state of the declarant; (2) the spontaneity of the statement; (3) the use of suggestive questioning; and (4) whether the statement can be corroborated. United States v. Grant, 42 M.J. 340, 343-44 (C.A.A.F. 1995); see United States v. Kelley, 45 M.J. 275, 281 (C.A.A.F. 1996); United States v. Cox, 45 M.J. 153, 157 (C.A.A.F. 1996).  Other indicators of reliability may include the declarant's age or the circumstances under which the statement was made.  Kelley, 45 M.J. at 281; see Cox, 45 M.J. at 157.  A court's factual findings on the existence of circumstantial guarantees of trustworthiness are reviewed for clear error.  United States v. Workman, 860 F.2d 140, 144 (4th Cir. 1988).  We accord a military judge "considerable discretion" in admitting evidence as residual hearsay.  Kelley, 45 M.J. at 281-82.

In this case, the Army Court of Criminal Appeals made several findings to support its conclusion J's statements to Investigator Bass-Caine had the kind of guarantees of trustworthiness found in other hearsay exceptions. First, it found that "the 'spontaneity' of [J's] nonverbal adjustment of her clothing prior to touching her vagina indicates trustworthiness." Donaldson, ARMY No. 9900544, slip op. at 7. In addition to the spontaneity of the statement, the court found that less than sixteen hours had transpired between the incident and the interview with the investigator, and the "events were still fresh in [J's] young memory." Id. at 8. The court further found that J had no motive to fabricate. Id. Finally, the lower court determined that J's statements to Investigator Bass-Caine were corroborated by J's statements to BT and Dr. Rogers.

Appellant challenges these findings on several bases. First, he asserts that J's action in adjusting her clothing to show where Appellant touched her is not an indication of reliability because "[i]t is not uncommon for a child of this age to remove her clothing in front of an adult." Appellant particularly notes that J's actions and her statement were not surprising in light of the fact that J was present when her mother recounted J's initial statement on at least three

30

occasions--to Ms. Sandreth, Officer Hagen, and SK, the latter discussion culminating in a heated argument.

In addition, Appellant objects to the lower court's finding that despite the passage of time, the substance of the statement showed that the "events were still fresh in [J's] young memory." He argues that the lack of specificity in J's statement demonstrates that the events were not fresh in J's memory, but that she was relying on what her mother had told her. Appellant further objects to the court's finding that J had no motive to fabricate. He asserts that there is no support for this finding and it is persuasive only if one assumes that Appellant is guilty of the offense. Next, Appellant objects to the lower court's reliance on United States v. Lingle, 27 M.J. 704, 708 (A.F. Ct. Crim. App. 1988) in reaching its conclusion that J's tender age increased the probability that her statements were truthful. Appellant argues that Lingle is inapplicable in this case because J's statements were not made to a playmate, but rather to an adult. Finally, because Appellant contends that J's statements to her mother and Dr. Rogers are inadmissible, he maintains that J's statements to the investigator were not corroborated by admissible circumstantial evidence.

On the one hand, this Court has generally treated hearsay statements solicited by police officers, particularly when they are elicited in private conversations, with caution. United

States v. Ureta, 44 M.J. 290, 296 (C.A.A.F. 1995)(citing United States v. Pollard, 38 M.J. 41, 49 (C.M.A. 1993)). In addition, in this case, J's statements to Investigator Bass-Caine were preceded by several emotionally charged conversations between BT and Ms. Sandreth, Officer Hagan, and SK, each of which J heard, raising the concern that J's recollection of the events could have been colored by her mother's view of the incident. As Appellant notes, the lower court appears not to have considered this concern in reaching its determination nor substantiated its finding that J had no motive to fabricate.

On the other hand, we agree with the lower court that J's spontaneous act of pulling her panties aside and placing her finger by her vaginal area was an unusual event that supports a finding of reliability. Investigator Bass-Caine testified that she had never seen a child witness perform such an act. Moreover, because we conclude that the military judge did not err in admitting J's statements to her mother and Dr. Rogers, we disagree with Appellant that J's statements were not corroborated by admissible circumstantial evidence. Lastly, we disagree with Appellant that J's statements did not contain the degree of specificity normally associated with reliable statements. J was able to identify who touched her, where she was touched and the manner in which the touching occurred.

Therefore, while there are points to consider against admission of the statements as residual hearsay, Appellant has failed to demonstrate that the military judge abused his "considerable discretion" when he determined that the statements were accompanied by circumstantial guarantees of trustworthiness.  Kelley, 45 M.J. at 281-82.  We therefore conclude that the lower court did not err when it held that the military judge properly admitted J's statements to Investigator Bass-Caine under M.R.E. 807.

## CONCLUSION

The decision of the United States Army Court of Criminal Appeals is affirmed.

EFFRON, Judge (concurring in part and in the result):

I agree with the lead opinion with respect to the admissibility of the testimony of BT and Dr. Carrie Rogers.  I write separately regarding the lead opinion's conclusion that the testimony of Investigator Tracy Bass-Caine was admissible under the residual hearsay exception, Military Rule of Evidence 807 [hereinafter M.R.E.].

As our Court noted in United States v. Kelley, 45 M.J. 275 (C.A.A.F. 1996), the legislative history of the residual hearsay exception indicates that the exception should be used "very rarely, and only in exceptional circumstances."  Id. at 280 (citations and internal quotations omitted).  The express exceptions to the hearsay rule are tightly drawn and are limited to circumstances that offer assurance of reliability.  M.R.E. 807 requires that the circumstances of the making of a statement offered under the residual exception provide the same degree of assurance of reliability as is found under the specific exceptions.

The present case involves hearsay testimony by Investigator Bass-Caine about the results of her interview with J, the 3-year-old victim.  In the few hours that preceded the interview, J heard her mother engage in five emotionally charged conversations in which her mother recounted details of the incident to her sister, her best friend, an acquaintance of her

friend who was a deputy sheriff, Appellant's girlfriend, and a police officer. J was so distraught during her mother's interchange with Appellant's girlfriend that she covered her ears with her hands and cried while the two women yelled and cursed at each other.

The repeated, emotional recounting of the details by the mother -- a person who would have the trust and confidence of the child -- created a substantial risk of reinforcing the mother's description of the events in the mind of this 3-year old, as distinct from her own recollection of the events. Under these circumstances, there is a significant risk that J's responses to Investigator Bass-Caine involved an unreliable regurgitation of the mother's recitation rather than her own recollection.

The risk was not ameliorated in this case by evidence that would offer any objective assurance as to how the interview was conducted. This is particularly important in view of the degree of skepticism applicable when statements are sought by, and made to, police investigators. See, e.g., United States v. Ureta, 44 M.J. 290, 296 (C.A.A.F. 1995). In the present case, the questioning of J was undertaken by the investigator in private, with no video or audio recording or other means of assessing the details of the interview.

Under the circumstances of the case, this hearsay testimony does not present the type of special circumstance demonstrating guarantees of trustworthiness equivalent to the enumerated hearsay exceptions.  Nonetheless, in view of the admissibility of the balance of the evidence against Appellant, any error in admitting Investigator Bass-Caine's testimony was harmless.