# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39654**

————————————

**UNITED STATES**
*Appellee*

**v.**

**William N. KING**
Major (O-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 14 September 2020

————————————

*Military Judge:* Jefferson B. Brown.

*Approved sentence:* Dismissal. Sentence adjudged 11 November 2018 by
GCM convened at Offutt Air Force Base, Nebraska.

*For Appellant:* Major Mark J. Schwartz, USAF.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Captain Kel-
sey B. Shust, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges*.

Chief Judge J. JOHNSON delivered the opinion of the court, in which
Senior Judge POSCH and Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as
precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

J. JOHNSON, Chief Judge:

A general court-martial composed of officer members convicted Appellant,
contrary to his pleas and by exceptions, of one specification of willful dereliction
of duty and one specification of fraternization, in violation of Articles 92 and

134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 934, respectively.[1] The court-martial sentenced Appellant to a dismissal, and the convening authority approved the adjudged sentence.

Appellant raises two issues on appeal: (1) whether the evidence is legally and factually sufficient to support his convictions; and (2) whether the military judge erred by precluding cross-examination regarding the complainant's prior allegation of sexual harassment.[2] We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

Appellant was a psychiatrist who joined the Air Force in July 2015. He was stationed at Offutt Air Force Base (AFB), Nebraska, where he served in the base mental health clinic.

In October 2015, CC began visiting the Offutt AFB mental health clinic due to stress caused by problems at her workplace. At the time, CC was an active duty Air Force staff sergeant. Appellant was one of three mental health providers she saw at the clinic. CC saw Appellant for a total of five appointments between 29 October 2015 and 5 February 2016. Appellant recorded his "termination summary" for his treatment of CC on 7 September 2016.

CC later testified that she found Appellant "very nice" and "very attractive," and during her treatment she began to "see him in a sexual way." In February 2016, CC found Appellant's profile on the Tinder online dating application; after she "swiped" on the profile to indicate her interest, she and Appellant were "matched" on the site, indicating Appellant had swiped on her profile as well. According to CC, Appellant then contacted her using the Tinder messaging system. CC responded to Appellant, and Appellant indicated that he knew who she was.

According to CC, the Tinder conversation led to communication by other means, including instant messages, Snapchat,[3] and Facetime.[4] At trial, the Government introduced a 94-page exhibit consisting of text messages between

---

[1] All references in this opinion to the Uniform Code of Military Justice, Rules for Courts-Martial, and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] Appellant personally asserts the second issue pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[3] At trial, CC explained that Snapchat was "a picture and video messaging application that has an option to message with words as well."

[4] At trial, CC described Facetime as a "video messaging application."

Appellant and CC apparently commencing on 13 February 2016. In a message dated 14 February 2016, Appellant acknowledged that "initiat[ing] a conversation with a girl" who was a prior patient was "[c]ompletely against every ethic[al] principle" and "[c]ould ruin [his] career forever actually." Nevertheless, Appellant continued to engage in the text conversations, a predominant theme of which was CC's desire to engage in a romantic and sexual relationship with Appellant. Some of Appellant's own messages were also sexual in nature. For example, between 14 February 2016 and 29 February 2016, Appellant joked that when he was drunk he might send her nude photos of himself; asked CC if she "look[ed] better with clothes on or off;" responded positively to CC's description of her breasts and buttocks; described himself performing oral sex on CC; and requested a video of CC having an orgasm. At one point CC commented on the size of Appellant's penis, which implied he had sent her a naked photo of himself. CC's messages were consistently more frequent and longer than Appellant's messages, but Appellant continued to converse with her when it was very clear she sought an intimate relationship.

In addition to the messages, CC would later testify that on one occasion in February 2016 she went to Appellant's home where she engaged in various consensual sexual acts with him. In addition, CC stated that in the course of their relationship, Appellant had sent CC a naked photograph of himself that depicted his penis, and she had sent him photos of herself topless and wearing lingerie.

Over time, after the sexual encounter CC described, Appellant's text messages indicate increasing caution and unwillingness to commit to any continuing relationship. CC continued to send Appellant messages attempting to maintain some sort of association with him—sometimes angry, sometimes plaintive, sometimes attempting to continue conversation by turning the subject to topics such as music or gardening. Appellant responded intermittently with terse, although generally not unfriendly, replies. On 29 February 2016, in response to CC's complaint that Appellant "just seem[s] all about the chase and I'm looking for my copilot," Appellant texted, "The chase isn't fun for me. I want something real and I dig you a lot. Just with all the variables [I]'m hesitant that's all." In a message dated 7 March 2016, in response to CC's continuing anxious messages, Appellant texted: "I told you that we could never have any sort of relationship." In a series of messages dated 18 April 2016, Appellant and CC engaged in the following exchange:

> [CC:] I think we should hangout at some point during this week.
> If after that you want to continue freezing me out … You may do
> so.
>
> . . . .

[Appellant:] Why so keen on hanging out?

[CC:] It's been a long time since we've seen each other. We have many similarities and the [sic] proves true even now. Why are you so opposed to hanging out?

. . . .

[Appellant:] The fact that you are a former patient

[CC:] That barrier has already been broken. And I believe I have proved my trustworthiness.

. . . .

[CC:] You're not scared because I'm a former patient. You're scared because if we hang out, you might see what I see and then you wouldn't hold that other fact as high as you did.

[Appellant:] No it's solely because you're a patient. I'm sorry.

[CC:] What changed that you were initially okay with breaking that rule and now you're not?

[Appellant:] A lot of time to think about it

(First omission in original.) In response to additional messages from CC, in a text dated 3 May 2016 Appellant told her: "[N]o we can't be anything, not even friends, so it's best we say good bye and good luck." Appellant's final brief text exchange with CC was dated 23 June 2016 and related to an upcoming musical performance.

CC separated from the Air Force in January 2017 for reasons unrelated to her mental health counseling with Appellant. In September 2017, CC reported Appellant's conduct to the Air Force Office of Special Investigations (AFOSI). At trial, CC explained that in July 2017 she resumed seeing a mental health therapist, but she realized she was not going to be able to get "closure" on her experience with Appellant unless she reported what happened.

When CC went to the AFOSI in the fall of 2017 she did not still possess the phone she had used to communicate with Appellant in early 2016. AFOSI agents told her that the text messages would be "very valuable" and not having them would be a "challenge" to the investigation. However, in March 2018 CC found text messages with Appellant on her laptop computer, which had been synchronized with her phone at the time she sent the messages in 2016. She provided the computer to AFOSI and gave the agents a limited consent to search for messages between herself and Appellant. As a result, the AFOSI was able to recover the 94 pages of text messages described above. However, no photos or other media exchanged between Appellant and CC were recovered from either the laptop or other sources.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399).

The elements of the specification of willful dereliction of duty in violation of Article 92, UCMJ, for which Appellant was convicted include: (1) that Appellant had a certain duty, that is, to refrain from seeking[5] sexual activity with a patient who was receiving or had previously received his psychological services and treatment; (2) that Appellant knew of the duty; and (3) that on the dates and at the location prescribed, Appellant was willfully derelict in the performance of that duty by seeking sexual activity with CC who was receiving or had previously received his psychological services and treatment. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 16.b.(3).

---

[5] The court members found Appellant not guilty by exceptions to the words "and engaging in."

The elements of the specification of fraternization in violation of Article 134, UCMJ, for which Appellant was convicted include: (1) that on the dates alleged Appellant was a commissioned officer; (2) that on the dates and at the location alleged Appellant fraternized on terms of military equality with CC by sending CC messages of a sexual nature;[6] (3) that Appellant then knew CC was an enlisted member; (4) that such fraternization violated the custom of the Air Force; and (5) that under the circumstances Appellant's conduct was to the prejudice of good order and discipline in the armed forces. *See MCM*, pt. IV, ¶ 83.b.

**2. Analysis**

Taken together, the essence of the two specifications for which Appellant was convicted is that he sent CC messages of a sexual nature and sought a sexual relationship with her, which was wrongful because she was a patient or former patient and because she was an enlisted member. The Government introduced sufficient evidence to support both convictions. CC, an enlisted member, testified as to how she met Appellant in an official capacity as his patient at the on-base mental health clinic; that he contacted her through the Tinder dating application; how they exchanged messages of a sexual nature; and how he sent her a naked picture of himself and she sent him partially nude and scantily clad photos of herself. It is true that there were several potential sources of bias or a motive to misrepresent on CC's part that the Defense explored at trial and which are discussed below. However, CC's testimony regarding the offenses for which Appellant was convicted was powerfully reinforced by the messages between her and Appellant recovered from her computer that the Government introduced at trial. The Government also introduced phone records indicating Appellant received more than 20 phone calls from CC in February and March 2016, the longest of which apparently lasted over 23 minutes. In addition, CC was able to describe the interior layout of Appellant's home, and was aware of tattoos on Appellant's shoulder, back, and ankles; and CC's mother testified to a prior consistent statement CC made to her on 26 February 2016 that CC was having an intimate relationship with her psychiatrist.

The Government also introduced the testimony of Lieutenant Colonel (Lt Col) VW, an Air Force psychiatrist who testified as an expert in the field of forensic psychiatry. Lt Col VW testified that as a matter of professional ethics, psychiatrists are prohibited to have personal relationships with patients and former patients, to include sexual relationships. In addition, she testified the prohibition on sexual relationships with patients was also stated in Air Force

---

[6] The court members found Appellant not guilty by exceptions to several other charged activities, including *inter alia* "having sexual relations" with CC.

Instruction (AFI) 36-2909, *Professional and Unprofessional Relationships* (1 May 1999). Lt Col VW testified that an Air Force psychiatrist would have been trained on this prohibition both as part of general medical training and during residency, and that an Air Force psychiatrist would "absolutely" be aware of the prohibition. The military judge took judicial notice that paragraph 3.6 of AFI 36-2909 stated, *inter alia*, that personnel providing medical or psychological treatment "will not seek or engage in sexual activity with, make sexual advances to, or accept sexual overtures from persons who are receiving their services." Furthermore, Appellant's messages to CC indicate he was well aware his personal, nonprofessional contact with her was prohibited.

Appellant attacks the sufficiency of the evidence on several bases. He argues there is insufficient corroboration for CC's testimony. Appellant notes the sexual photos he allegedly exchanged with CC were not recovered, and argues there is no proof of the sexual encounter she describes at his home. He argues, as the Defense did at trial, that her knowledge of his tattoos, his home, and other details of his life such as his dog's name and a trip he took to Colorado in February 2016 were information CC could have obtained from viewing Appellant's social media accounts.

With regard to the 94 pages of messages, at trial the Defense suggested CC may have fabricated or tampered with these texts. On appeal, Appellant suggests it is suspicious that CC was able to "magically" recover the messages from the laptop over five months after she told the AFOSI she did not have them. The Government's expert witness in the field of digital forensics, MC, conceded that it was possible to falsely create two sides of an exchange of messages, and that it is possible to edit or alter after-the-fact metadata associated with messages. However, he also testified he saw no indication the messages in the exhibit had been modified, and that they appeared to have been created on the dates indicated in the exhibit. In addition, the content of the messages suggests their authenticity. With a few exceptions concentrated relatively early in the exchange, Appellant's statements are much briefer, noncommittal, and more guarded than CC's emotional, often pleading messages. Appellant's messages suggest an individual who transgressed professional boundaries, knew it, and regretted it, rather than a partner engaged in the intimate relationship CC desired. In short, they have a ring of truth, rather than conveying the impression of fabrications by an infatuated or embittered individual. We find no persuasive reason to doubt that the messages are what they appear to be, Appellant's speculation notwithstanding. In addition, Appellant has little answer for the phone records indicating he received a number of phone calls from CC during the time frame she testified he was having inappropriate contact with her.

At trial, the Defense attempted to suggest CC had been suffering from delusions. It called Dr. KN to testify as an expert in forensic psychology. Although

Dr. KN had not examined CC and offered no diagnoses, his testimony focused on the phenomenon of "erotomanic delusion," which Dr. KN summarized as the false belief "that there is a loving relationship with another person that is not in love with the person holding the delusion." The Defense elicited testimony from Dr. KN that certain aspects of this situation were "consistent" with erotomanic delusion. For example, such delusions typically develop during periods of heightened emotional stress, develop rapidly, and commonly involve drawing unwarranted conclusions from innocuous behavior or events—such as a psychiatrist's attentive and supportive behavior during treatment being interpreted as romantic or sexual interest. However, this theoretical explanation for CC's behavior is unconvincing. To begin with, Dr. KN did not and could not diagnose CC with such a condition based on the limited information available to him. Moreover, the three mental health professionals (including Appellant) who treated CC for several months entirely failed to detect or document such a condition. Indeed, their termination notes indicate CC concluded her course of treatment because her condition had improved and the goals of the treatment had been met. In addition, as explained by Dr. KN, the essence of erotomanic delusion is a false belief that the object of the delusion is in love with the person experiencing the delusion. The messages exchanged between Appellant and CC clearly indicate CC understood only too well that Appellant did not share the strong attraction to her that she felt toward him. Attraction, even infatuation, is not the same as delusion.

Appellant cites other potential sources of bias or motive to misrepresent. By her own description, CC had been "infatuated" with Appellant, but after their sexual encounter she felt "ghosted" by him, which made her "really upset." In addition, in February 2018, CC filed a claim against the Government under the Federal Tort Claims Act[7] for over $68,000 based on lost wages and the need for continued mental health therapy that she attributed to her mistreatment by Appellant. However, these potential biases do not defeat her credibility with respect to the offenses for which Appellant was convicted in light of the corroborating evidence, particularly the messages and phone records.

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's conviction of Charges I and II and their specifications beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297–98. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325.

---

[7] 28 U.S.C. §§ 2671 et seq.

## B. Evidence of Prior Sexual Harassment Complaint

### 1. Additional Background

Before trial, the Government submitted a motion in limine to exclude testimony the Defense intended to elicit regarding CC's character for truthfulness. The military judge conducted a hearing on the motion and received the testimony of Master Sergeant (MSgt) CT, a member of CC's squadron at Offutt AFB. MSgt CT was not in CC's direct chain of supervision, but he worked in the same area and had frequent contact with CC and her supervisor. MSgt CT testified that he had formed the opinion that CC was "not very truthful." MSgt CT described multiple circumstances that contributed to this opinion, including his belief CC had made untrue statements regarding arriving for duty on time and completing her assigned work. However, foremost among the bases for MSgt CT's opinion was his understanding that CC had made a complaint that MSgt CT had verbally sexually harassed CC; MSgt CT denied that he made the alleged comment.

The Defense sought to have MSgt CT testify to his opinion regarding CC's character for truthfulness. The Government objected on the grounds that MSgt CT had an inadequate foundation for his opinion. The military judge overruled the Government's objection; however, he further held that if MSgt CT did testify the military judge would instruct the members that CC had previously made an allegation of workplace harassment against MSgt CT, which MSgt CT consistently denied, and this allegation was the primary basis for MSgt CT's' opinion. Ultimately, the Defense elected not to call MSgt CT.

The Government called three witnesses who knew CC at her prior assignment at Cannon AFB, New Mexico, to testify regarding her character for truthfulness.[8] CC's former squadron commander, former squadron superintendent, and a retired master sergeant testified to the effect that, in their opinions, CC was a truthful person. However, each of the witnesses had been out of contact with CC for between three and six years.

The Defense sought to cross-examine these witnesses regarding, *inter alia*, their knowledge that CC had made an unsubstantiated claim of sexual harassment. The Government objected to any characterization of the sexual harassment claim as "false." The military judge did not permit cross-examination of the character witnesses regarding the sexual harassment claim. The military judge explained that although he found the Defense had a good faith basis to inquire about a false sexual harassment allegation, the falsity of the claim had not been established. The substance of the issue was simply an allegation and a denial. Moreover, the alleged harassment occurred after the point in time

---

[8] CC's mother also testified to her opinion that CC was "always truthful."

where the witnesses ceased having contact with CC, and therefore could not form part of the basis for their opinions. Accordingly, the military judge found the probative value of asking the witnesses about something they had no knowledge of was "minimal to nonexistent," and was substantially outweighed by the danger of unfair prejudice.

Trial defense counsel did cross-examine each of the three character witnesses regarding whether they knew CC had lied to her superiors at Offutt AFB about being late for duty and failing to complete assigned work. Each of the witnesses testified to the effect that they did not know about these incidents, but this information would not change their opinions based on their contact with CC at Cannon AFB.

Trial defense counsel did not attempt to cross-examine CC regarding the harassment allegation against MSgt CT.

### 2. Law

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017) (citation omitted). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003) (citing *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)).

After a witness's character for truthfulness has been attacked, that "witness's credibility may be . . . supported . . . by testimony in the form of an opinion about that character." Mil. R. Evid. 608(a). "'Do you know' or 'have you heard' type questions, including reference to specific instances of conduct, are a recognized method of testing a witness'[s] opinion concerning the character or a trait of character of a person, presuming there is a good faith basis for asking the question and it is otherwise admissible under our rules of evidence (which in most cases would include a [Mil. R. Evid.] 403 balancing analysis)." *United States v. Saul*, 26 M.J. 568, 572 (A.F.C.M.R. 1988) (citations omitted).

A military judge may exclude otherwise admissible relevant evidence if its probative value is substantially outweighed by a countervailing danger, including but not limited to unfair prejudice or confusion of the issues. Mil. R. Evid. 403. Where a military judge conducts a proper balancing test under Mil. R. Evid. 403 on the record, an appellate court will not overturn the ruling absent

a clear abuse of discretion. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (citation omitted).

### 3. Analysis

On appeal, Appellant personally asserts trial defense counsel "moved to be able to question CC about her [previous] false allegation and was denied this opportunity." He contends "[t]he military judge's ruling . . . prevent[ed] them from conducting an effective cross-examination of CC and presenting evidence to show CC's character for untruthfulness and motive to fabricate the allegations . . . ." Appellant's contentions are without merit.

To begin with, trial defense counsel did not attempt to cross-examine CC regarding the prior harassment allegation, and the military judge did not prevent them from doing so. Moreover, the military judge did not preclude MSgt CT from testifying regarding his opinion of CC's character for truthfulness. Therefore, there is no factual basis for Appellant's specific claim on appeal.

To the extent Appellant's argument is intended to address the military judge's ruling preventing the Defense from cross-examining the three character witnesses regarding the harassment allegation, we find no clear abuse of discretion in the military judge's application of Mil. R. Evid. 403. The military judge could reasonably conclude such a question had minimal probative value in impeaching the basis for the witnesses' opinions regarding CC's truthfulness because (a) the allegation occurred after CC transferred from Cannon AFB, and (b) the falsity of the allegation was not established. On the other side of the balance, the military judge could reasonably conclude permitting references to an unrelated, allegedly false allegation of sexual harassment risked exposing the court members to distraction, confusion of the issues, and unfair prejudice to the Government's case. We conclude the military judge's ruling was neither clearly unreasonable nor clearly erroneous.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court