# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39434**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jonathan D. SHAMESS**
Captain (O-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 23 August 2019

————————————

*Military Judge:* Andrew Kalavanos.

*Approved sentence:* Dismissal, restriction to base for 10 days, forfeiture of all pay and allowances, and a reprimand. Sentence adjudged 17 November 2017 by GCM convened at Hurlburt Field, Florida.

*For Appellant:* Major Patrick J. Hughes, USAF; Major Todd M. Swensen, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Anne M. Delmare, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges*.

Senior Judge J. JOHNSON delivered the opinion of the court, in which Judge POSCH and Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

J. JOHNSON, Senior Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of abusive sexual contact and one specification of fraternization in violation of Articles 120 and 134, Uniform

Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 934.[1,2] The court-martial sentenced Appellant to a dismissal, restriction to the limits of his base for ten days, forfeiture of all pay and allowances, and a reprimand. The convening authority approved the adjudged sentence, but deferred $2,665.00 of the adjudged forfeitures until the date of the convening authority's action.

Appellant raises six issues on appeal: (1) whether the military judge erroneously admitted hearsay testimony over defense objection; (2) whether the prosecution of the fraternization charge and specification violated Appellant's rights under Article 31, UCMJ, 10 U.S.C. § 831, and to due process, and was contrary to public policy; (3) whether the evidence of the fraternization charge and specification was legally and factually sufficient; (4) whether the military judge erroneously instructed the court members that a punitive discharge was a mandatory minimum punishment for the offenses of which Appellant was convicted;[3] (5) whether Appellant received ineffective assistance of counsel at trial; and (6) whether the military judge improperly admitted certain sentencing evidence. We find no prejudicial error and we affirm the findings and sentence.

## I. BACKGROUND

In 2015 and 2016, Appellant was stationed at Hurlburt Field, Florida. In August or September 2015, Appellant met Technical Sergeant (TSgt) JE[4] in a duty-related capacity; however, they were not members of the same unit. At the time, TSgt JE was unhappily married to another enlisted member. After Appellant, who was single, encountered TSgt JE by chance on two more occasions in the following months, the two arranged to meet for lunch at a restaurant. At a second lunchtime meeting at Appellant's home in December 2015,

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are found in the *Manual for Courts-Martial, United States* (2016 ed.).

[2] In accordance with his pleas, Appellant was found not guilty of one additional specification of abusive sexual contact in violation of Article 120, UCMJ.

[3] Appellant raised this issue as a result of an error in the transcription of the proceedings. Pursuant to an order of this court, on 1 March 2019 the military judge accomplished a certificate of correction of the record of trial in accordance with R.C.M. 1104(d), and clarified that the members had not been given an erroneous instruction regarding a mandatory minimum punishment as alleged. Accordingly, we do not further address this assignment of error.

[4] At the time of the charged offenses, TSgt JE was a staff sergeant with a different last name. For simplicity, this opinion will continue to refer to her as "TSgt JE."

Appellant and TSgt JE engaged in sexual intercourse. Appellant and TSgt JE engaged in sexual intercourse a second time in late December 2015 or early January 2016. The relationship ended in January 2016 after TSgt JE's spouse learned of it, as a result of which TSgt JE was ordered not to have contact with Appellant.

On 20 February 2016, while Appellant had yet to receive any disciplinary action for his relationship with TSgt JE, Appellant met then-Master Sergeant (MSgt) JP,[5] a female member of his unit, at an off-base self-storage facility near Hurlburt Field. Appellant had agreed to help load onto a vehicle certain items that MSgt JP was selling to Captain (Capt) NS, another member of the unit who also happened to be the mother of Appellant's child. Capt NS's mother was also present. After the items were loaded and Capt NS and her mother had departed, Appellant remained and told MSgt JP he had something to ask her. Appellant explained he had recently "gotten in trouble" for having an affair with a married enlisted woman, and he asked MSgt JP if she would write a character statement for him. According to MSgt JP, when she asked Appellant if he could find "civilians or officers to sleep with," Appellant responded to the effect "that his penis was going to get him kicked out of the military." Appellant and MSgt JP continued to talk for at least 45 minutes about various subjects, including Appellant's relationship with Capt NS and his assertions that he was being sexually harassed by a supervisor.

At the conclusion of their conversation, Appellant attempted to hug MSgt JP. In response, MSgt JP pulled her arms in defensively to cover her chest. According to MSgt JP, Appellant put his arms around her anyway. MSgt JP squatted down to get out of the hug. Appellant then lifted MSgt JP and pushed her against her vehicle so that she was bent slightly over the fender, facing the vehicle. Appellant pressed his pelvis into MSgt JP from behind and pinned her arms to her sides with his arms wrapped firmly around her. Appellant then moved his face close to the left side of MSgt JP's face and breathed heavily as he shifted his hands to "methodically" squeeze her breasts three times with both hands. MSgt JP made a reference to Appellant's allegedly abusive supervisor, which caused Appellant to let go. At that point, Appellant "kind of laughed it off" as MSgt JP prepared to leave. Before MSgt JP drove away, Appellant asked her again if she would provide the character reference as requested. MSgt JP responded, "sure, send me the template," and drove away. MSgt JP later testified that she agreed to provide the reference because she

---

[5] MSgt JP retired from the Air Force after the charged offenses occurred but before she testified at Appellant's trial. For simplicity, this opinion will continue to refer to her as "MSgt JP."

"didn't want to further aggravate the situation" and felt that was the "quickest way to leave."

As MSgt JP drove, she began crying and called her boyfriend at the time, Staff Sergeant (SSgt) RD,[6] who was an Air National Guardsman stationed in Vermont. When SSgt RD did not answer, MSgt JP texted Appellant the following message: "Hey that wasn't cool. You're asking for my help and do that to me. It took me a minute to process but I'm not ok with that. Bad decision making. Don't bother sending me the template." Appellant responded by text: "I'm sorry I thought we were playing around." MSgt JP replied: "They are not yours to touch," followed by "Too far too far."

Either during this text exchange or immediately after, MSgt JP called SSgt RD a second time, and this time he answered. SSgt RD later testified that MSgt JP sounded "very upset, distraught." According to SSgt RD, MSgt JP told him she had been speaking with an officer friend when she was "helping some friends move," when the officer pushed her on her car, breathed on her, and "grabbed her breasts."

On 14 March 2016, Appellant's group commander issued him a letter of reprimand (LOR) for his conduct with TSgt JE. The LOR alleged, *inter alia*, "that on or about 1 December 2015 to on or about 13 January 2016, you knowingly fraternized and formed an unprofessional relationship with an enlisted member," and "engaged in sexual relations with an enlisted member" in violation of "the customary bounds of acceptable behavior in the Air Force." On 21 March 2016, Appellant submitted a response in which he took "full responsibility" for his actions. Appellant's conduct with TSgt JE for which he was reprimanded was also the basis for his subsequent conviction for fraternization in violation of Article 134, UCMJ.

## II. DISCUSSION

### A. Hearsay

#### 1. Additional Background

At trial, in an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing prior to SSgt RD's testimony, the Defense objected to SSgt RD's anticipated testimony regarding what MSgt JP told him on 20 February 2016 on the basis of hearsay. Assistant trial counsel responded that the testimony was admissible on two bases. First, she argued MSgt JP's statements to SSgt RD would be admissible hearsay as excited utterances under Mil. R. Evid. 803(2). Second, she argued

---

[6] At the time of the charged offenses, SSgt RD was a senior airman. For simplicity, this opinion will continue to refer to him as "SSgt RD."

the statements were admissible as non-hearsay because they qualified as prior consistent statements offered "to rehabilitate the declarant's credibility as a witness when attacked on another ground" under Mil. R. Evid. 801(d)(1)(B)(ii).

In an oral ruling, the military judge agreed with the Prosecution on both counts. The military judge found:

> [W]ith regard to the excited utterance exception to the hearsay rule, the testimony from the witness was that she, you know, she experienced the event. . . . I do find that the timeframe is approximately 10 minutes from the alleged event to the time that she actually spoke with her then boyfriend at the time. She testified to her emotional state. It looks as though the government is going to lay . . . the foundation . . . for an excited utterance. So, as it relates to an exception under excited utterance, the defense objection is overruled.

> As it relates to [Mil. R. Evid.] 801(d)(1)(B)[(ii)], I do believe, the Court finds that [MSgt JP's] credibility was impeached through cross-examination in terms of her ability to remember how sure she was of certain things and whether or not she gave inconsistent statements to [the Air Force Office of Special Investigations (AFOSI)] and on the stand. So . . . I am overruling the defense objection as to [Mil. R. Evid.] 801(d)(1)(B)[(ii)]. I find that the proffered testimony is appropriate to rehabilitate the declarant's credibility as a witness because it has been attacked.

**2. Law**

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017) (citation omitted). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003) (citing *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)).

Mil. R. Evid. 803(2) provides that an "excited utterance," defined as a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," is an exception to the general prohibition on hearsay evidence. *See* Mil. R. Evid. 801, 802; *Bowen*, 76 M.J.

at 87–88. The excited utterance exception is based on the premise "that a person who reacts to a startling event or condition while under the stress of excitement caused thereby will speak truthfully because of a lack of opportunity to fabricate." *United States v. Jones*, 30 M.J. 127, 129 (C.M.A. 1990) (internal quotation marks omitted). "The guarantee of trustworthiness of an excited utterance is that the statement was made while the declarant was still in a state of nervous excitement caused by a startling event." *United States v. Chandler*, 39 M.J. 119, 123 (C.M.A. 1994) (citation omitted). To determine whether a hearsay statement qualifies as an excited utterance, we apply a three-pronged test: "(1) the statement must be 'spontaneous, excited or impulsive rather than the product of reflection and deliberation'; (2) the event prompting the utterance must be 'startling'; and (3) the declarant must be 'under the stress of excitement caused by the event.'" *Bowen*, 76 M.J. at 88 (quoting *United States v. Arnold*, 25 M.J. 129, 132 (C.M.A. 1987)).

A prior consistent statement is not hearsay if it is offered "to rehabilitate the declarant's credibility as a witness when attacked on another ground." Mil. R. Evid. 801(d)(1)(B)(ii).

**3. Analysis**

Appellant contends the military judge abused his discretion with respect to both bases for his admission of MSgt JP's statements to SSgt RD on 20 February 2016. Because we find the military judge did not abuse his discretion as to excited utterance under Mil. R. Evid. 803(2), we need not and do not resolve whether he erred with respect to prior consistent statements under Mil. R. Evid. 801(d)(1)(B)(ii). *See generally United States v. Finch*, 78 M.J. 781 (A. Ct. Crim. App.) (addressing the continued applicability of case law regarding prior consistent statements in light of the 2016 amendment to Mil. R. Evid. 801(d)(1)(B)), *review granted*, 2019 CAAF LEXIS 587 (C.A.A.F. 2019).

We evaluate the military judge's ruling in light of the three-prong test for an excited utterance set forth in *Arnold*, 25 M.J. at 132. We find the military judge could reasonably conclude that MSgt JP's statements to SSgt RD were "spontaneous" and "excited" rather than the product of "reflection and deliberation;" that the event prompting her statements was "startling;" and that MSgt JP remained under the stress of the event when she made the statements. *See id*. With little warning, Appellant—an officer in MSgt JP's unit—abruptly pushed her against a vehicle, pinned her arms by grasping her around the torso, pressed his pelvis into her from behind, breathed heavily next to her face, and squeezed her breasts deliberately and repeatedly. The military judge could properly conclude this unexpected assault by a trusted superior was of a nature to shock and upset MSgt JP. Moreover, MSgt JP's testimony that she was crying when she spoke to SSgt RD, reinforced by SSgt RD's subsequent

testimony that MSgt JP sounded "very upset" and "distraught," supports the military judge's conclusion.

Appellant emphasizes MSgt JP was able to compose and send three texts to Appellant at approximately the same time as she was speaking to SSgt RD, and therefore she had the opportunity to reflect and deliberate. However, we find that under the circumstances MSgt JP's three angry texts to Appellant are not fatal to the military judge's ruling. In *United States v. Donaldson*, the CAAF identified a number of factors courts have employed to determine whether a statement was made under the stress of a startling event. 58 M.J. 477, 483 (C.A.A.F. 2003) (quoting *Reed v. Thalacker*, 198 F.3d 1058, 1061 (8th Cir. 1999)) (additional citation omitted). Beyond SSgt RD's testimony that MSgt JP sounded "distraught," several of the *Donaldson* factors favor admission of the statements as an excited utterance. Specifically, the military judge reasonably concluded the statements were made relatively close in time to the event—within ten minutes of the assault. In addition, MSgt JP initiated the calls to SSgt RD as well as the texts to Appellant, rather than responding to someone else's inquiry. The characteristics of the event, specifically the surprising, forceful, and sexual nature of the assault by an officer in MSgt JP's unit, were of a nature to induce more than momentary stress and excitement. Furthermore, the subject matter of the statement—a description of the assault itself—tends to support that MSgt JP remained upset by the incident.

Recognizing the deference we afford a trial judge when we review for an abuse of discretion, we do not find the military judge's ruling to be "'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *McElhaney*, 54 M.J. at 130 (citations omitted).

## B. Prosecution for Fraternization

Appellant renews the argument he made at trial claiming that he should not have been tried for conduct that was the subject of the LOR he received for fraternizing with TSgt JE because the matter was "over" until it was "resurrected" when his alleged abusive sexual contact of MSgt JP, which the Defense did contest, was discovered. At trial, the Government did not introduce statements from Appellant's LOR response during the findings phase. The Government did introduce the LOR and Appellant's response to it during sentencing proceedings, without further defense objection.

### 1. Additional Background

As noted previously, on 14 March 2016 Appellant was served with a LOR signed by his group commander that addressed his unprofessional relationship with TSgt JE. The LOR advised Appellant that he had the opportunity to voluntarily submit comments or documents for "consideration concerning this action." Although Appellant's written acknowledgement of receipt of the LOR—

which did not signify an admission of guilt or concurrence with the action—was mandatory, "[a]ny other comments or documents" Appellant chose to provide were "voluntary."

On 21 March 2016, Appellant submitted a memorandum in response to the LOR, accompanied by several character statements and other material. Appellant's memorandum stated, *inter alia*, he took "full responsibility for this incident" which "let down my fellow Airmen, the Special Tactics community, and the Air Force." Appellant asserted he had been "deeply humbled" by the experience and was "extremely sorry." Also on 21 March 2016, Appellant's group commander annotated on the LOR that the commander had considered Appellant's response and determined the LOR remained an "appropriate course of action."[7]

The charges and specifications alleging Appellant's abusive sexual contact on MSgt JP and his fraternization with TSgt JE were preferred on 15 September 2016 and referred for trial on 4 January 2017.[8]

On 24 April 2017, pursuant to Mil. R. Evid. 304(d), the Government disclosed to trial defense counsel various admissions Appellant had made in his 21 March 2016 LOR response. During a motion hearing prior to entry of pleas, the Defense moved to suppress those statements as "a matter of equity." Civilian defense counsel conceded the Defense was taking "a very unique and novel position," in support of which he had found "no case law." Nevertheless, he argued that because Appellant provided a response to the LOR "with the understanding that that would be the end of the matter," it did not seem "right" or "fair" to use that response against him at his court-martial. Trial counsel responded that he was aware of no authority that required suppression of the statements.

In an oral ruling, the military judge denied the Defense's motion to suppress Appellant's LOR response. The military judge found Appellant's statements in the response were made voluntarily and were therefore admissible under Mil. R. Evid. 304. Furthermore, the military judge found the statements were relevant under Mil. R. Evid. 401, and that their probative value was not

---

[7] Appellant's performance report closing in April 2016 included a statement that he had received a LOR for fraternization and having an unprofessional relationship with a noncommissioned officer. Appellant submitted a response to the performance report in which he once again took "full responsibility for [his] actions resulting in the unprofessional relationship."

[8] An additional, unrelated charge and specification of abusive sexual contact, of which Appellant was ultimately found not guilty, were preferred on 4 May 2017 and referred on 11 July 2017.

substantially outweighed by any countervailing dangers under Mil. R. Evid. 403.

### 2. Law

We review a military judge's ruling on a motion to suppress for an abuse of discretion. *United States v. Jones*, 73 M.J. 357, 360 (C.A.A.F. 2014) (citation omitted). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *Donaldson*, 58 M.J. at 482 (citation omitted). We review issues of legal sufficiency de novo. Article 66, UCMJ, 10 U.S.C. § 866; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

Mil. R. Evid. 304(a) provides that upon timely defense motion or objection, "an involuntary statement from the accused, or any evidence derived therefrom, is inadmissible at trial," with two limited exceptions that are not directly implicated in the instant case. *See* Mil. R. Evid. 304(e). Mil. R. Evid. 304(d) requires the prosecution to disclose to the defense prior to arraignment all oral and written statements made by the accused that are known to the trial counsel and relevant to the case, and all evidence derived therefrom, that the prosecution intends to offer. "When the defense has made an appropriate motion or objection under this rule, the prosecution has the burden of establishing the admissibility of the evidence." Mil. R. Evid. 304(f)6). "The military judge must find by a preponderance of the evidence that a statement by the accused was made voluntarily before it may be received in evidence." Mil. R. Evid. 304(f)(7).

Article 31(a), UCMJ, 10 U.S.C. § 831(a), states: "No person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him." "No statement obtained from any person in violation of [Article 31, UCMJ], or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial." Article 31(d), UCMJ, 10 U.S.C. § 831(d).

### 3. Analysis

As noted above, at trial the Defense objected to the use of Appellant's LOR response on the basis of "equity" without reference to any particular legal authority. Appellant raises a similar objection on appeal but now invokes various rights, including the Fifth Amendment's[9] guarantee of due process and protection from double jeopardy; the Article 31, UCMJ, protection from self-incrimination and involuntary statements; and this court's responsibility to "review[ ] a trial to ensure it does not violate basic notions of fundamental fairness or

---

[9] U.S. CONST. amend. V.

public policy." *See, e.g., United States v. Riley*, 72 M.J. 115, 120 (C.A.A.F. 2013) (reviewing whether military judge fulfilled his responsibility to ensure a pretrial agreement comported with basic notions of fundamental fairness). Nevertheless, as at trial, Appellant fails to identify any decision by the CAAF, by this court, or by our sister courts that holds the Government is prohibited from using an accused's statements in response to a LOR in a subsequent court-martial for, among other charges, the misconduct that was the subject of the LOR.

We find the applicable law is that which the military judge relied upon in making his ruling, specifically the prohibition on the use of coerced and unlawfully-induced statements found in Article 31(d), UCMJ, and in Mil. R. Evid. 304. The essential question is whether Appellant made the statements voluntarily. We find the military judge appropriately found by a preponderance of the evidence that the statements were voluntary. *See* Mil. R. Evid. 304(f)(7). The LOR was not an interrogation or a request for a statement and it did not implicate Fifth Amendment or Article 31, UCMJ, protections against self-incrimination. Appellant was afforded the opportunity to respond, and he was specifically advised such a response was voluntary. There is no evidence Appellant was induced to submit a response by any misleading promise that he would not be prosecuted for his relationship with TSgt JE or that any statement he made would not be used against him in the future. On the contrary, the LOR advised Appellant that any written response he made would become part of the "record." Nor is there evidence the LOR was a subterfuge issued in bad faith to elicit an incriminating response with an eye towards future prosecution. Moreover, the contents of that response were entirely up to Appellant; instead of admitting to the alleged misconduct, he might have instead, for example, focused on his duty performance, his deployed service, or other accomplishments or distinctions. That Appellant was faced with difficult decisions in responding to the LOR and decided, after consideration, it would be in his best interest to acknowledge his misconduct, does not make it his statements involuntary.

Appellant relies upon *United States v. Pierce*, 27 M.J. 367, 368–70 (C.M.A. 1989), to argue the use of his prior LOR for a charged offense should be subject to the same restrictions our superior court has imposed on the use of prior nonjudicial punishment issued under Article 15, UCMJ, 10 U.S.C. § 815, for a charged offense. In *Pierce*, the court acknowledged that "[a]bsent some sinister design, evil motive, bad faith, etc., on the part of military authorities, it is not a violation of due process to court-martial a servicemember for a serious offense, even though he has been punished nonjudicially." *Id.* at 368–69. However, the court continued, "[i]t does not follow that a servicemember can be twice *punished* for the same offense or that the *fact* of a prior nonjudicial punishment can be exploited by the prosecution at a court-martial for the same

conduct." *Id*. at 369. The court held that where an accused had previously received nonjudicial punishment for conduct subsequently prosecuted in a court-martial, the accused must be given complete credit for any punishment previously administered, the nonjudicial punishment action could not be used for any evidentiary purpose at trial, and the accused controlled whether the prior punishment would be made known to the court-martial for consideration in sentencing. *Id*. Appellant contends "[t]he same application of *Pierce* must also extend to administrative discipline, like Appellant's LOR for fraternization."

We are not persuaded by Appellant's reasoning. The CAAF has never extended *Pierce* to administrative actions not governed by the UCMJ, and *Pierce's* prohibition on double *punishment* pursuant to the UCMJ for the same conduct does not apply to Appellant's LOR which is an administrative action, not a punishment. Accordingly, Appellant is not the gatekeeper for either the LOR or the statements he submitted in response to it, which are instead governed by the general rules regarding statements by an accused and evidence in findings and sentencing.

Appellant argues the failure to suppress his statements in response to the LOR will create a chilling effect and undermine the goal of resolving disciplinary issues at the lowest appropriate level with the goal of rehabilitation, because servicemembers receiving such administrative discipline will be discouraged from accepting responsibility and expressing remorse for misconduct. We concede that some individuals may have to make difficult decisions about how to respond in such circumstances, and that in some cases the perceived risk of admitting guilt may outweigh the perceived benefit of acknowledging responsibility. However, this is not a new development. Moreover, such decisions, although perhaps difficult, nevertheless do not render the resulting statements involuntary, which is the standard for suppression under Article 31(d), UCMJ, and Mil. R. Evid. 304.

Appellant further suggests the admission of the LOR with his response to it potentially made the court members "upset" that Appellant had pleaded not guilty to the offense when they deliberated on his sentence, despite his constitutional right to require the Government to prove his guilt beyond a reasonable doubt. Again, we are not persuaded. Of course, Appellant is entirely correct that he had the legal and moral right to plead "not guilty" to the fraternization charge, regardless of whether or not he believed he was guilty of the charge. However, Appellant made that decision in the context of having already accepted "full responsibility" for committing the alleged offense in response to both an administrative disciplinary action and an unfavorable performance report that were likely to be admitted at trial. Furthermore, the court members also heard unrebutted testimony from TSgt JE describing her sexual relationship with Appellant, as well as MSgt JP's testimony that Appellant frankly

told her he had an affair with a married enlisted member. In his closing argument on findings, civilian trial defense counsel admitted Appellant's behavior with TSgt JE was criminal and "there's little I can say to refute the allegation." In light of the compelling evidence of Appellant's guilt and the fact that the Defense hardly contested the fraternization charge, any additional loss of good will from the introduction of the LOR and response in light of Appellant's pleas is speculative. Furthermore, if the Defense was concerned the military judge's sentencing instructions would be insufficient to address unfair prejudice arising from Appellant's pleas, the Defense could have requested additional instructions. *See* R.C.M. 920(c); *United States v. Carruthers*, 64 M.J. 340, 345 (C.A.A.F. 2007) (citations omitted).

Accordingly, we find no error in the military judge's denial of the defense motion to suppress Appellant's LOR response, in the admission of the LOR and response during sentencing proceedings, or more generally in Appellant's prosecution for fraternization with TSgt JE.

## C. Legal and Factual Sufficiency of Fraternization

### 1. Additional Background

At trial, TSgt JE testified regarding her sexual relationship with Appellant, which ended after her husband—also an enlisted member—discovered their relationship and reported it to her chain of command.

During MSgt JP's direct examination at trial she engaged in the following colloquy with assistant trial counsel regarding the events of 20 February 2016:

> A. [MSgt JP] . . . [Appellant] asked me if I could provide a character witness statement.
>
> Q. [Assistant Trial Counsel] Did he tell you what the character statement was for?
>
> A. He recently had gotten in trouble for fraternization with an enlisted, married female.
>
> Q. Did he tell you whether or not he'd had sex with an enlisted member?
>
> A. Yes, ma'am.
>
> Q. What did he say?
>
> A. He just said they had an affair and that her husband had found out though [sic] texts and emails or things of that nature and had turned them in.
>
> Q. So, he specifically said that she was enlisted?
>
> A. Yes, ma'am.

Q. How did you respond to that?

A. I asked him, "Can you find people that were civilians or officers to sleep with?"

Q. Did he say anything in response?

A. . . . Yes. He said something to the fact that his penis was going to get him kicked out of the military.

Q. [MSgt JP], are officers and enlisted members supposed to sleep together?

A. No, ma'am.

Q. How do you know that?

A. All officers and enlisted are told that as soon as they join the military from basic training, cadet, what have you. You know, you're told what professional and unprofessional relationships are, fraternization, and, it's, you know, good order and discipline.

Q. So, is it appropriate for officers to sleep with enlisted members?

A. No, ma'am.

Trial defense counsel made no objection to this testimony.

The military judge provided the court members with the following instructions regarding the charge of fraternization in violation of Article 134, UCMJ:

To find [Appellant] guilty of this offense, you must be convinced by legal and competent evidence beyond a reasonable doubt of the following elements:

(1) That . . . the accused was a commissioned officer;

(2) That [during the charged frame] at or near Fort Walton Beach, Florida, the accused fraternized on terms of military equality with [TSgt JE] by having sexual intercourse with [TSgt JE];

(3) That the accused then knew [TSgt JE] to be an enlisted member;

(4) That such fraternization violated the custom of the Air Force that officers shall not fraternize with enlisted members on terms of military equality; and

(5) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces.

. . . .

Not all contact or association between officers and enlisted persons is an offense. Whether the contact or association in question is an offense depends on the surrounding circumstances. Factors that you should consider include whether the conduct has compromised the chain of command, resulted in the appearance of partiality, or otherwise undermined good order, discipline, authority, or morale. The facts and circumstances must be such as to lead a reasonable person experienced in the problems of military leadership to conclude that good order and discipline in the armed forces have been prejudiced by the tendency of the accused's conduct to compromise the respect of enlisted persons for the professionalism, integrity, and obligations of an officer.

The military judge's instructions were in accordance with the *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 83.b., c. *See also Military Judges' Benchbook*, Dept. of the Army Pamphlet 27–9 (10 Sep. 2014) (*Benchbook*), ¶ 3–83–1. The Defense did not object to these instructions or request additional instructions regarding the offense of fraternization.

### 2. Law

We review issues of legal and factual sufficiency de novo. *Washington*, 57 M.J. at 399 (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325; *see also United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (citation omitted). "In conducting this unique appellate role,

we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

Whether a panel was properly instructed is a question of law we review de novo. *United States v. McClour*, 76 M.J. 23, 25 (C.A.A.F. 2017) (citations omitted). However, "[f]ailure to object to an instruction given or omitted waives the objection absent plain error." *United States v. Pope*, 69 M.J. 328, 333 (C.A.A.F. 2011) (citing R.C.M. 920(f)). "Plain error is established when: (1) an error was committed; (2) the error was plain, or clear, or obvious; and (3) the error resulted in material prejudice to substantial rights." *United States v. Hardison*, 64 M.J. 279, 281 (C.A.A.F. 2007).

**3. Analysis**

Appellant challenges the legal and factual sufficiency of his conviction for fraternization on three grounds. First, he argues this conviction for "mutually voluntary, private, non-deviate sexual intercourse" with TSgt JE is contrary to the holding of *United States v. Johanns*, 17 M.J. 862, 869 (A.F.C.M.R. 1983) (en banc), *rev'd in part*, 20 M.J. 155 (C.M.A. 1985). Second, Appellant contends the Prosecution presented insufficient evidence of the Air Force custom regarding fraternization. Third, Appellant avers the military judge's instructions to the court members were defective because he failed to define the term "custom." We address each contention in turn.

In *Johanns*, a majority of the court found "that as a matter of fact and law the custom in the Air Force against fraternization has been so eroded as to make criminal prosecution against an officer for engaging in mutually voluntary, private, non-deviate sexual intercourse with an enlisted member, neither under his command nor supervision, unavailable." 17 M.J. at 869 (emphasis omitted). However, in *United States v. Boyett* the court expressly limited the holding of *Johanns* to the facts reflected in the record of that case. 37 M.J. 872, 878 (A.F.C.M.R. 1993), *aff'd*, 42 M.J. 150 (C.A.A.F. 1995). Thus, in *Boyett* the court affirmed the appellant's conviction for fraternization based on a guilty plea despite the absence of a supervisory relationship between the paramours. *Id*. Similarly, the holding in *Johanns* does not constrain our assessment of the sufficiency of Appellant's conviction for fraternization, which turns on the evidence produced at his court-martial.

We find the Government did introduce legally and factually sufficient evidence to support the fraternization charge. Appellant properly notes the holding of our superior court that

> if the Government wishes to prosecute fraternization on the basis of a custom in the military service, testimony must be offered by a knowledgeable witness—subject to cross-examination—about that custom. To require less is to allow the factfinder to make a determination that the custom exists without any indication on the record as to what that custom is.

*United States v. Wales*, 31 M.J. 301, 309 (C.M.A. 1990); *see also United States v. Fox*, 34 M.J. 99, 103 (C.M.A. 1992) (quoting *Wales*). However, in Appellant's case the Prosecution did have a witness testify regarding a custom in the Air Force prohibiting sexual relations between officer and enlisted members. MSgt JP, a senior noncommissioned officer, testified to the effect that "all" Air Force members are trained that officers and enlisted members are forbidden to "sleep together" and that such conduct is "fraternization" and an "unprofessional relationship" that is contrary to "good order and discipline." Although MSgt JP did not use the specific term "custom," we find her testimony sufficiently described the plain meaning of that term.[10] In addition, MSgt JP's testimony was more concrete and specific as to the particular acts that constitute fraternization in the Air Force—i.e., sexual intercourse or "sleeping together"—than the "conclusory" and "circuitous" testimony the court found inadequate in *Fox*, 34 M.J. at 101–03. Although perhaps not a model of thoroughness or articulation, in light of the totality of the evidence in Appellant's case, we find MSgt JP's testimony was an adequate foundation for the court members and for this court to find Appellant's behavior violated a custom of the service.

Turning to the military judge's instruction, because the Defense did not object at trial we review the failure to define "custom" for plain error. *Pope*, 69 M.J. at 333 (citation omitted). First, we note the military judge gave verbatim the standard instruction for fraternization from the *Military Judge's Benchbook*, which does not specifically define "custom." *Benchbook*, ¶ 3–83–1. Second, we note the *Manual for Courts-Martial* similarly contains no definition for "custom" with respect to the offense of fraternization. *MCM*, pt. IV, ¶ 83. Third, Appellant fails to identify what definition of "custom" the military judge erroneously failed to provide, or even to propose such a definition.

Appellant's reliance on *Fox* in this respect is inapt. Appellant quotes a portion of the following passage from *Fox*:

> [T]he instructions regarding the "custom" element of fraternization offered no definition, no guidance, no focus on what is, in the Air Force, a critical requirement concerning the relationship.

---

[10] "[H]abitual practice or course of action that characteristically is repeated in like circumstances." *Custom*, BLACK'S LAW DICTIONARY (6th ed. 1990).

> Under these circumstances, it is as if no mention at all had been made of the need to find a violation of a custom: The members hardly could find a *violation* without any instruction at all as to the *custom*. Given the state of these instructions, there is no basis for concluding that the members affirmatively found "the necessary predicate facts beyond a reasonable doubt."

34 M.J. at 104. However, the "critical requirement" the court was referring to was not a general definition of the term "custom," but rather the Air Force-specific requirement at the time, under *Johanns*, of a superior-subordinate relationship in order to find that a consensual, private, non-deviate officer-enlisted sexual relationship amounted to fraternization in violation of Air Force custom. *Id.* Because *Johanns* effectively made the existence of such a superior-subordinate relationship an element of the offense the Government was required to prove in an Air Force prosecution, the members needed to be instructed on it. *See id.* However, as discussed above, *Boyett* subsequently explicitly limited the holding of *Johanns* to its particular facts and record; this is no longer the law in the Air Force and this passage from *Fox* is inapposite to Appellant's case.

Without a specific instruction on the definition of "custom," the court members could properly apply the term's common or plain meaning to the evidence and conclude Appellant's sexual intercourse with TSgt JE did in fact violate a custom of the Air Force. *See United States v. Bailey*, 77 M.J. 11, 15 (C.A.A.F. 2017) ("[I]t is a well known principle that '[w]ords generally known and in universal use do not need judicial definition.'") (quoting *United States v. Nelson*, 53 M.J. 319, 321 (C.A.A.F. 2000) (quoting *United States v. Gibson*, 17 C.M.R. 911, 935 (A.F.B.R. 1954)). Accordingly, we find the military judge did not commit plain, clear, or obvious error by omitting a specific definition of "custom." *See Hardison*, 64 M.J. at 281.

Furthermore, drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's conviction for fraternization beyond a reasonable doubt. *Barner*, 56 M.J. at 134. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction for fraternization is therefore both legally and factually sufficient.

**D. Ineffective Assistance of Counsel**

**1. Law**

The Sixth Amendment[11] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). Accordingly, we "will not second-guess the strategic or tactical decisions made at trial by defense counsel." *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (internal quotation marks and citation omitted). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza*, 67 M.J. at 474).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are [A]ppellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Gooch*, 69 M.J. at 362 (second alteration in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012).

**2. Analysis**

Appellant contends his civilian and military trial defense counsel, Mr. DW and Capt JF, failed to provide him effective assistance of counsel in several respects. Appellant's arguments are supported in part by a declaration he submitted to this court. At the Government's request, this court ordered affidavits from Mr. DW and Capt JF. Accordingly, Mr. DW and Capt JF submitted declarations addressing Appellant's claims of ineffective assistance. We have con-

---

[11] U.S. Const. amend. VI.

sidered whether a post-trial evidentiary hearing is required to resolve any factual disputes between the declarations, and we are convinced such a hearing is unnecessary in this case. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967). We address Appellant's assertions in turn.[12]

### a. Failure to Preserve Surveillance Video

The Government called Special Agent (SA) AW of the AFOSI as a witness during the findings portion of the trial. SA AW testified that on 22 February 2016, he and another agent and MSgt JP visited the self-storage facility where the abusive sexual contact took place on 20 February 2016. MSgt JP showed the agents where her storage unit was, where her vehicle was parked, and where the assault took place. SA AW took a number of pictures that were admitted as evidence at trial.

SA AW also reviewed video taken by the facility's security cameras. Although the video depicted when MSgt JP and Appellant arrived and departed through the main entrance of the facility, it did not capture the alleged assault. As SA AW put it, he "was unable to see any type of interaction between the two of them from the review of the video that we saw." The agents attempted to "download the footage," but they "never could get a working copy" so they "physically reviewed and took notes based off the time stamps that were on the video." At some point "much later," SA AW went back to the facility but learned the video from 20 February 2016 had been copied over and destroyed. On cross-examination, Capt JF questioned SA AW about his failure to obtain the video, to request that the facility preserve the video or to otherwise secure it, or to use the video to identify vehicles to search for other possible witnesses. During his argument on findings, Mr. DW commented briefly on the AFOSI's failure to obtain the security camera video.

On appeal, Appellant contends his trial defense counsel were ineffective for failing to seek an abatement of the proceedings or other relief due to the AFOSI's failure to preserve the security camera video. Appellant points to R.C.M. 703(f)(2), which provides:

> . . . [A] party is not entitled to the production of evidence which is destroyed, lost, or otherwise not subject to compulsory process.

---

[12] Appellant's claim of ineffective assistance is based in part on his counsel's alleged failure to object to an erroneous oral instruction to the court members that a punitive discharge was a mandatory minimum punishment in Appellant's case. Because the record, as corrected, makes clear no such instruction was given (see Note 3, *supra*), we find this allegation warrants neither further discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

> However, if such evidence is of such central importance to an issue that is essential to a fair trial, and if there is no adequate substitute for such evidence, the military judge shall grant a continuance or other relief in order to attempt to produce the evidence or shall abate the proceedings, unless the unavailability of the evidence is the fault of or could have been prevented by the requesting party.

*See United States v. Simmermacher*, 74 M.J. 196, 197 (C.A.A.F. 2015).[13] Appellant contends the destroyed video, perhaps if enhanced, might have provided leads to other possible witnesses to, or even direct evidence of, the incident. In support of his argument, Appellant emphasizes that Capt JF's cross-examination of SA AW focused primarily on the security video and that Mr. DW commented on the unavailable evidence in his closing argument.

In response, Capt JF states that he visited the self-storage facility on 12 October 2017, approximately one month prior to trial on the merits. There he observed the location of MSgt JP's storage unit and where her vehicle would have been parked in relation to the security cameras. He also spoke with employees and observed the field of view of the video monitors. He determined the cameras "would not have been able to show details of any altercation," and he concluded "[h]ad the video been preserved it certainly would not have been a key piece of evidence." Furthermore, SA AW's testimony was "consistent" with what Capt JF observed. Capt JF and Mr. DW both aver that Capt JF's focus on the missing video during his cross-examination was based on a strategic decision to cast doubt on the thoroughness of the investigation rather than on a belief the video would have been critical evidence.

We find trial defense counsel reasonably concluded the destroyed video was not "of such central importance" that it was "essential to a fair trial," and accordingly their failure to seek an abatement of the proceedings or other relief under R.C.M. 703(f)(2) lay well within the bounds of reasonable strategic and tactical decisions. *See Gooch*, 69 M.J. at 362; *Mazza*, 67 M.J. at 475.

### b. Failure to Call Certain Witnesses

Appellant next asserts his trial defense counsel were ineffective for failing to call two potential witnesses at trial. Appellant contends in his declaration

---

[13] The protection R.C.M. 703(f)(2) provides a military accused in this regard exceeds that provided by the Fourteenth Amendment's guarantee of due process, which requires an appellant to demonstrate: (1) the evidence had apparent exculpatory value at the time it was lost or destroyed; (2) the defense was unable to obtain comparable evidence by reasonably available means; and (3) law enforcement officials acted in bad faith by failing to preserve the evidence. *United States v. Terry*, 66 M.J. 514, 517–18 (A.F. Ct. Crim. App. 2008).

that these two witnesses observed MSgt JP flirting with him when he encountered MSgt JP in a bar approximately three months after the 20 February 2016 incident. In response, trial defense counsel explain they contacted both individuals, but neither of them confirmed that MSgt JP flirted with Appellant at the bar as he asserted. Accordingly, we find no basis for Appellant's claim of ineffective assistance in this regard.

### c. Failure to Object to Letter of Counseling

Appellant's final allegation of ineffective assistance concerns a letter of counseling (LOC) Appellant was issued by his supervisor in September 2016. Appellant's declaration to this court, the declarations of trial defense counsel, and evidence from Appellant's performance reports introduced in the sentencing portion of Appellant's trial indicate the following sequence of events.

On 8 September 2016, Appellant's supervisor issued him a LOC for improper duty-related communication with a government contractor and improper utilization of ammunition. On 13 September 2016, Appellant submitted a detailed rebuttal asserting the LOC was "unjustified and entirely inaccurate," and requesting that it be withdrawn. Appellant received a performance report closing in December 2016 which included the negative comment that he received a LOC for "wrongful disposition of government property without authorization." On 24 February 2017, ten days after Appellant was served a copy of the performance report, he submitted an extensive rebuttal, which was duly maintained with the performance report.

Also in February 2017, Appellant filed a complaint through Inspector General (IG) channels challenging the LOC. In June 2017, the IG informed Appellant that the IG investigation had been paused on the advice of the Air Force Special Operations Command Office of the Staff Judge Advocate (AFSOC/JA). After substantial engagement by Capt JF, the IG investigation resumed in late July 2017. However, the investigation was not completed before Appellant was tried and ultimately sentenced on 17 November 2017. The September 2016 LOC was not introduced at trial, but the corresponding performance report and Appellant's rebuttal to it were introduced as prosecution sentencing exhibits, along with Appellant's other performance reports.

Capt JF and Appellant disagree as to the outcome of the IG investigation. According to Capt JF, Appellant's commander withdrew the LOC shortly after his trial, and as a result, on 5 January 2018, the IG investigation was closed without reaching a conclusion on the alleged factual basis for the LOC. According to Appellant, in January 2018 Appellant was notified the IG investigation determined the LOC was unsubstantiated and was subsequently rescinded. However, both agree the LOC was removed after Appellant's trial.

Appellant faults his counsel for failing to "ascertain the status of the LOC investigation" or to "object to the LOC during presentencing." For multiple reasons, we find Appellant has failed to demonstrate he is entitled to relief. Whatever the merits of the underlying factual controversy, Appellant has failed to show that either his performance report or the LOC were implemented contrary to regulation or otherwise unlawfully. Therefore, we find little basis to conclude the military judge would have sustained an objection to the performance report at trial. *See United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001) (quoting *United States v. Napoleon*, 46 M.J. 279, 284 (C.A.A.F. 1997)) (noting that claims of ineffective assistance based on failure to move to exclude evidence require demonstration of a reasonable probability such a motion would be successful).

In addition, Appellant has not demonstrated Capt JF's engagement on his behalf with respect to the IG investigation fell "measurably below" the performance to be expected of a defense counsel. When he became aware the investigation had been paused, Capt JF successfully engaged with AFSOC/JA and the IG to get it restarted. There is no basis to conclude that additional harrying of the IG would have produced a favorable conclusion to the investigation before Appellant's trial.

Finally, we are not persuaded the result of Appellant's trial would have been more favorable had the reference to the LOC been redacted or had the entire report been excluded from the trial. Appellant's extensive rebuttal was provided with the report for the court members' consideration, mitigating the effect. Furthermore, the impact of the reference to the LOC—a low-level administrative action entirely unrelated to the charged sexual misconduct— likely paled in significance to near-transparency compared to the offenses for which Appellant was sentenced. Accordingly, we find Appellant has failed to demonstrate either deficient performance or prejudice. *See Datavs*, 71 M.J. at 424 (citations omitted).

### E. Sentencing Evidence

#### 1. Law

We review a military judge's decision to admit sentencing evidence for an abuse of discretion. *United States v. Stephens*, 67 M.J. 233, 235 (C.A.A.F. 2009) (citing *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000)). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *Donaldson*, 58 M.J. at 482 (citation omitted). However, "[w]hen an appellant does not raise an objection to the admission of evidence at trial, we first must determine whether the appellant waived or forfeited the objection." *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018) (citation omitted). "[F]ailure to make the timely assertion

of a right" constitutes forfeiture. *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (citations omitted). We review forfeited issues for plain error. *Id.* To prevail under a plain error analysis, an appellant must show "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007) (citations omitted).

R.C.M. 1001(b)(2) provides that during sentencing proceedings the Government may introduce from the accused's personnel records evidence of, *inter alia*, the character of the accused's prior service, including "evidence of any disciplinary actions."

Whether an error is harmless is a question of law we review de novo. *Bowen*, 76 M.J. at 87 (quoting *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003)). "When there is error in the admission of sentencing evidence, the test for prejudice 'is whether the error substantially influenced the adjudged sentence.'" *United States v. Barker*, 77 M.J. 377, 384 (C.A.A.F. 2018) (quoting *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009)). We consider four factors when determining whether an error had a substantial influence on the sentence: "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* (citations omitted).

**2. Analysis**

At trial, Appellant did not object to his performance report for the period ending in December 2016 which contained a reference to his LOC for "wrongful disposition of government property without authorization," as described above. On appeal, Appellant concedes he "had no basis to object to the admission of this evidence at trial, because the outcome of the [IG] investigation had not yet concluded to know that the LOC would be rescinded." Nevertheless, Appellant contends this performance report "should not have been considered by the members at all" because the allegation was subsequently "unsubstantiated," and therefore he is entitled to a sentencing rehearing or to a reduction in his sentence.

We disagree. First, as noted above, Appellant does not contend the performance report or the underlying LOC were procedurally defective, and he admits he had no basis to object at trial. Accordingly, we have no basis to find the military judge committed "plain or obvious" error by admitting the report. Second, assuming *arguendo* the admission of the reference to the LOC was error, we do not find Appellant was prejudiced by it. After considering the relative strength of the Government and Defense cases and the quality and materiality of the evidence, in the context of all the evidence and the offenses for which

Appellant was sentenced, we are convinced the reference to the LOC had no substantial influence on the sentence. *See id.*

Appellant also contends the admission of his April 2017 LOR for fraternization—and the consequent adverse performance report—was "legally insufficient" and warrants relief. Appellant again invokes *Pierce* to argue both that (1) he was entitled to be the "gatekeeper" as to whether evidence of his previous "punishment" was to be presented to the court members, and (2) he was entitled to have sentencing credit for this "punishment" assessed against his sentence. *See* 27 M.J. at 368–70. We remain unpersuaded. We find *Pierce's* limitations on nonjudicial *punishment* imposed under the UCMJ inapplicable to administrative actions such as Appellant's LOR and adverse performance report. Accordingly, Appellant's request for a new sentencing hearing or sentence relief is without merit.

### III. Conclusion

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court